[Crim. No. 3619. Third Dist. Mar. 15, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. THEODORE
ROOSEVELT CURTIS, Defendant and Appellant.

George D. Humphreys, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris Maier, Assistant Attorney General, and Daniel J. Kremer, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant was convicted of grand theft committed by obtaining money by false pretenses. His contentions on appeal can best be explained from a background of the facts proved.

Defendant met Mrs. Esther M. (we will preserve partial anonymity) in June 1963 at the Senior Citizens' Center in Sacramento. She was a widow 68 years of age. Defendant called himself "Major Theodore Roosevelt Curtis." After the meeting, a warm friendship developed. Curtis told her that he was an auditor for two Sacramento stores, Weinstocks and Roos-Atkins; that they had employed him to go to the stores periodically late at night and count their cash. Either then or later he was actually employed as a salesman for a local furniture store.

As their friendship grew, Esther introduced Curtis to the several members of her family. She invited him to her home which she shared with one of her two adult daughters, Nina W., and the latter's children. Later she introduced Curtis to Ada M., 79 years old, also a widow. He, with Esther, was a dinner guest at Ada's home on September 9, 1963. Curtis immediately found Ada simpatico. Learning that she was a

member of the Eastern Star, he asserted that he was a Mason. Curtis told Esther that he liked Ada and wanted to see her more often; that she was his kind of a person. A second invitation by Ada for dinner was extended two days later. Somehow Curtis had ascertained that Ada had a savings account. It was in the sum of $10,000 and constituted the life savings of Ada and her deceased husband. During the evening Curtis asked Ada if she would lend him five or six thousand dollars. This was preceded by the following build-up: He told the two women that he had previously been in the furniture business and had had two partners, both of whom had absconded with $60,000. He had had to close the business but still had a stock of furniture in a warehouse and a lease to a building then (and now) occupied by the Tower of Clothing, an established business on Howe Avenue in Sacramento County. Under this lease he had to pay $200 per month rent. His subtenants, the owners of the clothing store, were only paying him $150 per month and therefore he was accumulating a deficit at the rate of $50 per month. This was straining his resources. To recoup his losses he had arranged to reenter the furniture business with two new partners, each of whom was to invest $15,000. His own contribution to the enterprise was to be (1) the lease (he said he had given the owners of the Tower of Clothing a two weeks' notice to quit), (2) the warehoused furniture worth $9,000, and (3) $6,000 in cash. Temporarily without funds, he needed to borrow the $6,000. He told Ada he would pay her 7 per cent interest on the loan.

He also said that the wives of his partners were going to work in the business. He wanted Esther to work there also as a hostess, serving coffee to customers. He confided in Ada that he wanted to marry Esther. Esther, in the next room, overheard this. It was the first time Curtis had mentioned the subject of matrimony. Curtis told Ada that he had a brother in Ogden, Utah, a Mormon bishop, who would perform the ceremony. Esther is a Mormon.

Ada first stated she wanted to think the matter over. The deliberation was brief. She told Curtis that night she would lend him $6,000. Testifying, she explained her motives: first, the promise of payment of 7 per cent on her loaned money which was then in a savings account would bring her greater income; secondly, she was particularly happy that Esther had found a congenial marital partner of her own religion.

The next day the two women and Curtis went to the bank.

Ada withdrew $6,000 and handed the money to Curtis. At his insistence it was paid in cash. There was no receipt and no promissory note given. Curtis left stating he would "put the money in escrow." The furniture store was to be opened on December 21, 1963.

Two days later Curtis again called on Esther. He drove up in a Cadillac. He stated he had traded in his 1952 Buick and had received an $1,800 trade-in allowance. (The Buick had been bought for $100 with money loaned to him by Esther.)

He had acquired the Cadillac, he said, because it was important in starting up a new business to keep up appearances.

On about September 20th Esther's daughter, Nina W., learned of the $6,000 loan by her Aunt Ada to Curtis. The suspicions of the daughter, her sister and her sister's husband had been aroused previously by what they regarded as Curtis' "tall tales"—which were indeed tall. Here are some of them, testified to by Nina, and said to have been related at a family dinner party at Esther's home and on other occasions when Nina was present: Curtis said that he had been an aviator in World War I. (To another witness he had related that he had been a "wing man" in Quentin Roosevelt's squadron and had been shot down.) He had been in the hospital many times. During one experience at the U. S. Naval Hospital (Bethesda?) "in Virginia" he had had his stomach removed and a goat's stomach substituted with a "window" left to permit observation by the medical staff during recuperation. He had also apparently been in World War II because a Japanese officer had slashed his arm. For want of adequate field hospital facilities, his almost-severed arm had been taped up and he had been flown in that condition to Letterman Hospital in San Francisco for surgery. This had been so successful that full use of the arm had been restored. He stated that a cousin of his was Vice-President of the United States and that his son had been decorated by General Eisenhower.

Esther's two daughters and her son-in-law commenced an investigation. This included a visit to the Tower of Clothing. Discovery was made there that Curtis never had had a lease with them. Other fruits of their investigation resulted in a visit to a lawyer and, ultimately, to the district attorney. A civil suit was brought and at the time of the trial it was still

pending. Forty-five hundred dollars deposited in a bank account in Curtis' name was under attachment.

After the visit to the district attorney, a detective from the Sacramento Police Department went with Esther to call upon Curtis. Curtis first denied, then admitted, that he contemplated a business venture. He stated its location was still undetermined. When asked whether he had obtained $6,000 from Ada, he said, "See my attorney." Curtis was arrested.

The prosecution's witnesses at the trial included Esther, Ada, Esther's daughter, Nina W., and two Senior Citizens' Center acquaintances of Curtis and Esther. Detective Soski was also a witness. The facts related above are from their testimony. Clarence Coey was another prosecution witness. He is the owner of the premises occupied by the Tower of Clothing. He testified that Curtis had never had a lease to the premises. The owners of the clothing store were his tenants and their lease had three years to run with an option of renewal. Coey did know Curtis, however, as a salesman once employed by a furniture firm which had occupied Coey's building more than a year before the Tower of Clothing had leased the property.

The defendant did not testify in his own behalf. The defense produced one witness, Detective Soski. The principal purpose was impeachment of Ada's testimony as to Curtis' representations with reference to the lease. The detective's report had shown that when he had first interviewed Ada she then said that "Mr. Curtis stated that his intention was to obtain a lease." She had also, according to the report, told the officer that Esther had urged her to lend Curtis money.

The discussion to follow will cover defendant's contentions on appeal.

▪ Both the prosecuting attorney and the court (the former in argument and the court in its instructions to the jury) commented upon inferences the jury might be permitted to draw (under appropriate circumstances) from a defendant's failure to take the stand. Defendant argues this violated defendant's privilege, guaranteed by the Fifth Amendment of the United States Constitution, against self-incrimination. The California Constitution guarantees the same right. Article I, section 13, provides: "No person shall . . . be compelled, in any criminal case, to be a witness against himself." The same section of the California Constitution goes on to say, ". . . but in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any

evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury.'' Penal Code section 1323 also provides similarly for comment by the prosecuting attorney on the defendant's failure to ''explain or deny'' adverse testimony. Defendant contends that the provision just quoted cancels out the guaranty of the first sentence of the section of the California Constitution quoted and of the Fifth Amendment and is therefore void, this because the Fifth Amendment supersedes California constitutional provisions even in state court proceedings.

In *Malloy* v. *Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], the Fifth Amendment was held to be binding upon state court prosecutions through the operation of the due process provisions of the Fourteenth Amendment. But in a very recent decision of the California Supreme Court, *People* v. *Modesto* (Feb. 11, 1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], where the prosecuting attorney (in argument) and the trial court (in instructing the jury) had both commented on the defendant's failure to testify, the court holds in the majority opinion (by Chief Justice Traynor) that such comment was not in violation of the Fifth Amendment. The opinion first states that there had been no authoritative holding by any United States Supreme Court case that state comment was impermissible; that the rule forbidding such comment in federal prosecutions was founded upon the U. S. Supreme Court's interpretation of federal statutory law (18 U.S.C.A. § 3481) and not upon constitutional demand; that the scope of California constitutional and statutory permission to comment was narrow, since the prosecution was not relieved of its burden to prove every essential element of the crime beyond a reasonable doubt, since no presumption of guilt or of the truth of any fact arises, and since no inference can be drawn if defendant does not have the knowledge necessary to explain or deny the evidence against him. It was pointed out (on page 450 of 62 Cal.2d) that ''The comment serves merely to advise the jury how to treat the evidence the prosecution has introduced''—permitting the jury, when it appeared from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, to consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable. (Citing *People* v.

*Ashley*, 42 Cal.2d 246, 266-269 [267 P.2d 271].) And the court in *Modesto* concludes (on page 450) that such "carefully circumscribed comment" does not significantly impair any protection the privilege affords the innocent. Justice Traynor's opinion, in reviewing *Malloy, supra,* states (on page 452 of 62 Cal.2d) it had "refrained from expressing any opinion on the constitutionality of the comment rule." In *Malloy,* Justice Brennan's (majority) opinion had condemned any practice which could penalize a defendant who had decided not to testify. It said that in making such a determination, a defendant should enjoy "the unfettered exercise of his own will." The California comment rule, Justice Traynor's opinion reasons, does not interfere with that right. And it adds (on page 452): "In this respect it cannot be overemphasized that whether or not the court or prosecutor comments on the defendant's failure to testify, the jury will draw adverse inferences therefrom. It will expect the defendant to present all the evidence he can to escape conviction, and it will naturally infer that his failure to explain or deny evidence against him when the facts are peculiarly within his knowledge arises from his inability to do so. 'Such an inference is natural and irresistible. It will be drawn by honest jurymen, and no instruction will prevent it.' [Citing cases.]"

Justice Peters dissented in *Modesto, supra.* In his dissent, however, he would hold that comment, although error, does not necessarily result in a denial of a fair trial or constitute a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

Whether the view of the majority of our Supreme Court or of Justice Peters be accepted (and we are bound by the former), the facts in this case are a graphic illustration of the inevitability that a jury would draw adverse inferences from Curtis' failure to deny or offer any explanation of his bizarre behavior, as that behavior had been described by the prosecution and as we have related it above. Obviously, he had received Ada's $6,000 and the prosecution's proof that it was obtained as a part of a two-pronged confidence scheme in which both Esther and Ada were duped was overwhelming.[1] And jurymen would have to have been moronic NOT to draw inferences from defendant's failure to deny or explain facts so obviously within his knowledge.

We turn to other contentions of defendant. The argument

---

[1]That it was also a plan so fantastic as to defy understanding how it ever could have succeeded, even with a woman anesthetized by the ether of December love and another with senses perhaps dulled by advanced years, is beside the point. The fact is it DID succeed.

that the evidence is insufficient to support the verdict is so insubstantial that we disdain discussion.

Defendant's claim that the trial court committed error as regards a disclosure of Curtis' prior criminal record, however, *does* justify discussion. The claim is based upon an incident during the cross-examination of the prosecution's witness, Nina W., Esther's daughter. The matter objected to has in appellant's brief been excised from the transcript as follows:

"Q. What time were you having the disagreement with your mother on the morning of the 27th? A. That was the morning that Mother said that she was going to marry him. Q. For sure? A. Yes. Q. And you, of course, knew that there wasn't any lease? A. And I also knew of his criminal record. MR. SALAMY: Well now, your Honor, I move that that be stricken. THE COURT: You asked for it, counsel. MR. SALAMY: No, I didn't, your Honor. I move that that be stricken from the record and the jury admonished to disregard it. THE COURT: Well, the jury will disregard that last statement. MR. SALAMY: Q. All right. This was the morning of the 27th? A. That's correct. MR. SALAMY: I move that your Honor declare a mistrial at this time. I don't think it's proper for the jury even to hear anything like that. THE COURT: Not going to get a mistrial. You keep on asking questions of these people, these people are not used to being witnesses in a Court. MR. SALAMY: I am not trying to argue, Judge. THE COURT: You ask for something and you finally get it, you do that at your own peril. You're not—I am not going to grant a mistrial."

The trial judge was justified in his denial of defendant's motion for a mistrial. He had instructed the jury to disregard the nonresponsive reply regarding defendant's criminal record and, although he had inadvertently failed to rule on the motion to strike, there was effectually a granting of the motion and the jury would have so understood it. (*People* v. *Grant*, 53 Cal.App.2d 286, 288 [127 P.2d 567]; *People* v. *Grimes*, 113 Cal.App.2d 365, 371 [248 P.2d 130].)

The remarks, "You asked for it," "You ask for something and you finally get it, you do that at your own peril," constituted error. The attorney's question had *not* "asked for" the answer received. But as so frequently happens when an excerpt of testimony is taken from context, the judge's remark is not quite what it seems. The cross-examination which had preceded the quoted portion had

been substantial, searching and enlightening—but the illumination had not revealed defendant in a favorable light at all.[2] Several pages back from the quoted portion of the transcript, the cross-examiner asked the witness the following question: "and what was it that you and she [the witness' sister] did of the investigative nature after she had gone to the District Attorney's office, if anything?" This question, of course, would have permitted the very answer regarding Curtis' criminal past, which was later given. That that answer was not then given does not alter the fact that the defense seemed to be trying to bring before the jury everything the investigators had found out about the defendant, and seemingly was giving the witness carte blanche to relate all their findings. The witness' subsequent answer, though non-responsive to the particular question, was not unnatural, and, perhaps, neither was the judge's remark.

While we conclude the remark to have been error, we do not find it prejudicial. The outline of the facts above will suggest why. Discussion of the reasons will be deferred to the concluding portion of this opinion.

■ Defendant's next contention is that the prosecuting attorney was guilty of "impugning the integrity of the defendant's attorney." The matter to which he refers occurred during the cross-examination of Esther. In it the defense attorney brought out that Esther and Curtis had made a trip to Reno, September 17, 1963, and had there occupied the same room overnight in a hotel. The judge was reluctant to permit questioning on this matter but admitted it upon defendant's contention that the evidence proved bias and prejudice, also that it had some relevancy to the issue that the lending of the money by Ada was not purely a business transaction. Esther first denied the joint occupancy of the hotel room, later when asked about it, answered, "Yes, to my sorrow." The subject had minor relevancy and the

[2]The witness, her sister and her brother-in-law were shown to have carried on a most thorough investigation of Mr. Curtis. We are sure that in hindsight the defense must regret having insisted upon developing the fruits of their search in detail. From the cross-examination the jury learned the following: That the investigating party had consulted with the owners of the Tower of Clothing store; that from them it was learned that Curtis had had no lease with them. It was also brought out that they had uncovered Curtis' bank account of $4,500. It was also learned that Curtis represented he had had a cousin who was Vice-President of the United States and that his son had been decorated by General Eisenhower, that Curtis had represented himself to be well-to-do, with a substantial retirement income forthcoming from the Air Force and that he had substantial furniture in storage.

district attorney's characterization of this element of the defense as "mud-slinging" and as "the most distasteful aspect of this case," was within the limits of justifiable argument by the prosecution. (See *People* v. *Hardenbrook,* 48 Cal.2d 345, 352 [309 P.2d 424] ; *People* v. *Patterson,* 118 Cal.App.2d 45, 48 [256 P.2d 992].) Moreover, there was no objection. (2 Witkin, Cal. Procedure (1954) Trial, § 10, p. 1735.).

 Defendant's last contention relates to the admission in evidence of newspaper clippings which had been found on defendant's person (in his wallet) at the time of his arrest. The clippings reported the death of two wealthy elderly Sacramento businessmen who had left substantial estates to their widows. The persons named in the two clippings were unrelated to each other; unrelated to anyone connected with the trial. The clippings were undated but one article gave the decedent's death as May 11, 1963, and the other reported the February 4, 1962, death of the subject of the article. Curtis had explained the presence of the clippings in his wallet to Officer Soski by saying he had cut them out to show a friend at the Senior Citizens' Center. Objection to the admission of the clippings in evidence was upon the grounds that they were immaterial and hearsay. They were not hearsay since they were not offered to prove the truth of any matter stated therein. They had been offered upon the theory that they were relevant to prove motive and intent, also "a continuing scheme or plan."

 Evidence is "relevant" when it "in some degree advances the inquiry, and thus has probative value." It is prima facie admissible. (McCormick on Evidence, p. 319; *People* v. *Jones,* 42 Cal.2d 219, 222-223 [266 P.2d 38].) It is admissible unless some "counterbalancing factors" of "extrinsic policy" require its exclusion. (Witkin, Cal. Evidence (1958) § 112, p. 134.) Where facts offered may unduly arouse the jury's emotions of prejudice and the dangers of its uses, therefore, outweigh the probative value of the evidence offered, it will be excluded. (McCormick, *op. cit.,* p. 319.) Thus evidence which *merely* shows a criminal disposition or propensity for crime and nothing more is within the exclusionary rule even though a showing of criminal proclivity *does,* in itself, have probative value. (Witkin, *op. cit.,* p. 158.) If, however, the evidence in addition " 'tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any

material fact sought to be proved by the defense,' " it may be admissible (*People* v. *Henderson,* 60 Cal.2d 482, 494-495 [35 Cal.Rep. 77, 386 P.2d 677]) even though it also creates a general inference that defendant is a bad man. ▮ The question of whether probative value outweighs the possible prejudicial effect on the jury is a decision primarily resting in the sound discretion of the trial court. (*People* v. *Henderson, supra,* at p. 495.)

▮ The taking of money with felonious intent (i.e., with "false pretenses") was a necessary element of the crime with which defendant in the case at bench had been charged. (*People* v. *Ashley,* 42 Cal.2d 246 [267 P.2d 271].) The fact that Curtis had taken the money was not a disputed issue. His intent or motive in taking the money was, however, a vital issue. These clippings had relevancy as circumstantial evidence to prove that issue. They at least raised some inference that defendant's interest in Esther and Ada was not merely social but a part of a Curtis wealth-sharing plan involving widows with money generally. Thus the evidence tended "logically, naturally, and by reasonable inference to prove . . . a material issue." (*People* v. *Jones, supra,* 42 Cal.2d 219, at p. 222.) The case is thus distinguishable from *People* v. *Chambers,* a recent decision of this court (December 1964) 231 Cal.App.2d 23 [41 Cal.Rptr. 551], where the defendant was charged with an assault upon a patient and where his only defense was an alibi. Because of this we held that neither intent nor a common plan or scheme was an issue. (Had the use of force by Chambers been defended upon the ground that he had restrained the patient but had used only sufficient force reasonably necessary for that purpose, the issue of intent and motive *would* have been involved.) The case at bench is more similar to *People* v. *Claborn,* 224 Cal.App.2d 38 [36 Cal.Rptr. 132], where defendant was charged with assault by purposely driving his automobile into a car driven by police officers, where the fact of the collision was undisputed, and where evidence of other altercations between defendant and police officers was held by this court (on page 44) to have been properly admitted to prove intent and motive.

The newspaper clippings offered and admitted in the case at bench were therefore relevant. But since they also inferentially suggested defendant's general criminal propensities and therefore were a type of evidence likely to arouse the prejudices of a jury, we still must explore, in determining their admissibility whether the probative value outweighed the

possibility of prejudice. In *People* v. *Henderson, supra,* as probably in most cases where the problem arises, the offered evidence involved defendant's actual commission of a crime other than the one for which he was being charged. Here there was neither proof nor contention that Curtis had actually mulcted other widows. The probative value of the newspaper clippings was therefore undoubtedly less weighty than proof of other *actual* "confidence game" ventures would have been. But, on the other hand, and for the same reason, its prejudicial effect upon the jury was also less weighty. The balancing process therefore seems to remain unchanged. Under all the circumstances we hold that there was no abuse of discretion in the trial court's admission of these clippings in evidence.

We have found error in the trial judge's failure to strike the non-responsive statement by Nina W. regarding defendant's "criminal record." Therefore, we must consider whether any miscarriage of justice has occurred. (Cal. Const. art. VI, § 4½.) Reversal for error is proper only when, after reviewing the entire record, including the evidence, it appears reasonably possible that a result more favorable to the appellant would have been reached in the absence of the error found. (*People* v. *Briggs,* 58 Cal.2d 385, 404 [24 Cal.Rptr. 417, 374 P.2d 257]; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].) In the latter case the court said (on page 835) that in determining the meaning of "miscarriage of justice" "[e]mphasis in the main . . . has been placed on the constitutional requirements of a fair trial and due process, . . ."

We have examined the record carefully in this case. We can find no aspect of the proceedings in which the defendant was denied a fair trial. Secondly, we can see no possibility that a jury of reasonable men and women would (without the error) have reached a different verdict in this case. We have referred to this above in our discussion of the effect of the California comment rule. We need not repeat what we said there. Nor need we reparaphrase the evidence reviewed. The record speaks loudly for itself. The prosecution's evidence showing guilt was overwhelming and we search vainly for some meaningful theory of the defense. The sole effort seems to have been to attempt to paint a picture of defendant as a sort of modern Munchausen, and indeed the case does have its ludicrous overtones. The cream of the jest, however, becomes somewhat curdled when one

remembers that this "guileless" old codger nearly succeeded in making off with 60 per cent of the life savings of one elderly woman and in senselessly humiliating a second. These are circumstances falling somewhat short of hilarious humor.

The purported appeal from the nonappealable order denying motion for new trial is dismissed. (Pen. Code, § 1237.) The judgment is affirmed.

Friedman, J., and Sparks, J. pro tem.*, concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 12, 1965.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.