**UNITED STATES of America,**
**Appellee,**

v.

**Ruby LAZARUS, Appellant.**

**No. 23290.**

United States Court of Appeals,
Ninth Circuit.

April 16, 1970.

Rehearing Denied June 18, 1970.

E. David Rosen (argued), Miami, Fla., Thomas F. Call, Los Angeles, Cal., for appellant.

Gerald F. Uelmen (argued), Asst. U. S. Atty., David R. Nissen, Asst. U. S. Atty., Wm. Matthew Byrne, U. S. Atty., Los Angeles, Cal., for appellee.

Before CARTER and HUFSTEDLER, Circuit Judges, and THOMPSON,* District Judge.

**JAMES M. CARTER, Circuit Judge:**

Lazarus appeals from his conviction upon three out of seven counts of perjury under 18 U.S.C. § 1621, based on his testimony before a grand jury. He raises four questions: Did the district court err, (1) in denying his motion for a mistrial based upon a Government witness' testimony linking Lazarus to the Mafia, (2) in admitting portions of transcript of the hearings before the grand jury in which Lazarus had asserted his privilege against self-incrimination, (3) in admitting bookmaking documents seized from a person other than Lazarus, and (4) in denying his motion for judgment of acquittal?

In 1966 a federal grand jury began an investigation of syndicated gambling activities after receiving information that a meeting of some of the members of the syndicate had been held at Palm Springs and that telephones were used during the meeting to transmit gambling information across state lines. The investigation was an inquiry into possible violations of federal laws concerning interstate transmission of gambling information, 18 U.S.C. § 1084, interstate travel in aid of racketeering enterprises, 18 U.S.C. § 1952, and of further possible violations of the Federal Communications Act and the Internal Revenue Code.

Lazarus was called before the grand jury on December 14, 1966. He refused to respond to any questions, invoking his Fifth Amendment privilege. He was again summoned to testify on March 9, 1967, and he again invoked his privilege and refused to testify. The Government thereupon obtained an order compelling Lazarus to testify pursuant to the immunity provisions of the Federal Communications Act, 47 U.S.C. § 409(*l*).

On March 10, 1967, he was called to appear before the grand jury to answer questions about his association with the other alleged participants at the Palm Springs meeting, about his own activities there, and about his knowledge of telephone calls from Palm Springs to Multiple Sports Service and to the Prokos brothers in Miami, Florida. Although he knew that he could no longer rely on the privilege in view of the immunity order, he declined to answer all questions put to him. The district court ordered him to answer, Lazarus refused, and the court found him in contempt for which he was committed to custody until he purged himself of contempt.[1] After seven months in custody, Lazarus requested and was granted an appearance to testify before the grand jury on October 18, 1967. It is his testimony on October 18, 1967, that is the subject of his prosecution for perjury.

Lazarus admitted before the grand jury that he visited the residence in Palm Springs for five or six days and

---

* Honorable Bruce R. Thompson, United States District Judge, Reno, Nevada, sitting by designation.

1. Reports of the contempt proceedings are found in In re Lazarus (C.D.Cal.1967) 276 F.Supp. 434; In re Lazarus (C.D. Cal.1967) 276 F.Supp. 450.

that Elliott Paul Price, Tony Salerno, Jerry Zarowitz, Vincent Alo, and two women were also present during that time. The subject of Count One of the indictment was his testimony that he did not use the telephones in the Palm Springs house and that he did not see anyone else do so. The subject of Counts Four and Seven was his testimony that Mickey Zion was the only bookmaker with whom he ever placed a bet and that he never placed bets at bookmaker's odds with the Prokos brothers in Miami. The jury returned guilty verdicts on Counts One, Four and Seven.

## I

### The Denial of Motion for a Mistrial

The Government's first witness was a former United States Attorney who, during his Government service, had been in charge of the Special Prosecutions Division, engaged in prosecuting cases in the general field of organized crime. He was called by the Government in order to establish the materiality to the grand jury investigation of Lazarus' testimony. The court instructed the jury that the testimony was not received to prove the truth of the facts contained therein but to show the nature of the investigation and what prompted it.

In response to questions about the information he had relayed to the grand jury and upon which its investigation was partially based, the witness stated:

"[W]e had information that in Palms Springs, California, in October 1965 there was a meeting at a certain residence there, which involved people who were reputedly very high up in the Mafia organized crime syndicate in this country.

"\* \* \*

"We had information that the phones in this residence had been used by certain individuals and that the telephones were used to make calls across State lines to other parts of the United States, in connection with gambling activities.

"We also heard—had information that a dispute had arisen among certain members of an alleged gambling syndicate, and that one of the purposes of the meeting at Palm Springs was to resolve that dispute.

"\* \* \*

"We heard that there was present Elliott Paul Price, Tony Salerno, Jerry Zarowitz, Vincent Alo, also known as Jimmy Blue Eyes, Ruby Lazarus and two young women who were reputed to be girl friends of two of the people I have named.

"\* \* \*

"Elliott Paul Price, we had information he was involved on a large scale in gambling activities, not only interstate in the country but also in Canada and in the Montreal area. We had information he was involved in a bookmaking operation in and around Boston.

"We also knew that he was under indictment for Federal violations in the Southern District of New York.

"\* \* \*

"As to Vincent Alo and Tony Salerno, we had information they were high important figures in organized crime activity on the East Coast and had been connected with Vito Genovese."

Lazarus' counsel did not move to strike the testimony referring to the Mafia, but he did move for a dismissal [TR. 69], which we will charitably treat as a motion for a mistrial, on the ground that the witness' reference to the Mafia was prejudicial. The court denied the motion, admonished the prosecuting attorney to avoid references to the Mafia, and reiterated its prior instruction to the jury that the witness' testimony was hearsay, not received for the purpose of proving the truth of the facts asserted.

Two days later the prosecuting attorney in reading the transcript of the grand jury proceedings of March 10, 1967, read a portion of the transcript in which Lazarus declined to answer the

question: "Did Alo use the phone in connection with the gambling or other activities of the criminal syndicate known as La Cosa Nostra or the Mafia?" [TR. 531]. Lazarus' counsel had been previously supplied with the transcript and had specified out of the presence of the jury certain portions thereof which he objected to and did not want read, and the court by rulings complied with his request. [TR. pages 86, 138, 161]. He did not object beforehand to the inclusion of the challenged segment of the transcript quoted above. Nor did he object when it was read. At the conclusion of the reading he neither objected, moved to strike or moved for a mistrial. [TR. 551]. Some time later, following the noon recess, he moved for a mistrial based on the reference to the Mafia, and the motion was denied. [TR. 572].

Testimony concerning the information presented to the grand jury was relevant to prove the subject of the grand jury's investigation and thus to prove the materiality of Lazarus' testimony before the grand jury. Disregarding for the moment the first witness' use of the word "Mafia," that information was that Lazarus and others had attended a high level meeting of members of an organized interstate gambling syndicate and that the activities of those who attended the meeting may have violated several federal statutes. Although reference to the Mafia was by no means necessary to the proof of the materiality issue, it was not wholly irrelevant to the inquiry. Part of the information spread before the grand jury was a claimed link between the members of the Palm Springs meeting and the Mafia.

Lazarus' argument is that even if the Mafia reference had some probative force, that evidence was so prejudicial that its reception deprived him of a fair trial and that the district court's denial of his motion for a mistrial was a clear abuse of discretion requiring reversal of his conviction. (*Cf.* Odom v. United

States, (5 Cir.1967) 377 F.2d 853; Scott v. United States, (5 Cir.1959) 263 F.2d 398; United States v. Meagley, (7 Cir. 1957) 239 F.2d 637).

■ There well may be cases where reference in testimony linking the defendant to the Mafia, may require the granting of the defendant's motion for a mistrial. But this case is not such a case. The context of Lazarus' testimony was an investigation of organized crime and racketeering. The reference to the Mafia was made in that context. The public has long been exposed to extensive publicity about the evils of organized crime. We have no reason to suppose that publicity about the evils of the Mafia has been more extensive or more virulent than that devoted to members of organized crime who are not Mafia associates. We likewise have no reason to suppose that the public has less hatred toward big time racketers who are not members of the Mafia than it has toward those who are. We cannot say that the omission of any reference to the Mafia would have perceptibly brightened the jury's image of Lazarus or his associates. Moreover, nothing in the later developments at the trial points unerringly to undue prejudice to Lazarus that could be attributed to the unfortunate mention of the Mafia. We hold that the mention of the Mafia did not deprive Lazarus of a fair trial and that the district court did not abuse its discretion in denying his motion for a mistrial. (*Cf.* People v. Curtis, (1965) 232 Cal.App.2d 859, 43 Cal.Rptr. 286).

■ The second reference to the Mafia was made when the prosecutor was reading a transcript of Lazarus' interrogation before the grand jury on March 10, 1967. Lazarus' counsel, knowing the content of that transcript, made no objection specifically directed to the challenged question and no motion to strike it before it was read to the jury. Counsel cannot thus withhold objection to testimony and thereafter seek a mistrial based upon its introduction.

## II

### The Use of the Transcripts

Portions of the grand jury transcripts of December 14, 1966 and March 9 and 10, 1967 [2] were read to the jury. They were admitted for the purpose of proving that Lazarus' false testimony on October 18, 1967, was willful. The portions indicated instances where Lazarus had exercised his right against self incrimination and had refused to answer certain questions.

We think that the record shows (a) the appellant did not preserve his record below nor raise a constitutional question; (b) that in any event he suffered no prejudice requiring a reversal from the admission of such reference; (c) we believe that Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) is not controlling.

(a) *Appellant Did Not Make a Proper Record and Did Not Raise Constitutional Objections to the Use of the Grand Jury Transcripts.*

■ A general objection is not sufficient to raise a constitutional question. In On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) the court stated that a general objection "* * * is insufficient to preserve such a specific claim as violation of a constitutional provision * * *." [pages 749–750, n. 3, 72 S.Ct. page 970]; Ignacio v. People of the Territory of Guam, 413 F.2d 513 (9 Cir.1969).

■ Rule 51 Fed.R.Crim.P., requires that the objection and the grounds therefor be stated. Failure to object constitutes a waiver. *Ignacio*, supra.

We have searched the record [3] and the only objections we find are that the

---

2. The transcripts are identified as follows:
    Ex. 1—Transcript of grand jury proceedings of 12/14/66.
    Ex. 2—Transcript of grand jury proceedings on Mar. 9, 1967; and transcripts of grand jury proceedings on Mar. 10, 1967 after Lazarus had been ordered to answer questions and granted immunity by the district judge.
    Ex. 3—Transcripts containing order of district judge on March 9, 1967 and transcript of proceedings before district judge on March 10, 1967 when Lazarus was held in contempt.
    Ex. 4—Order granting immunity on March 9, 1967.
    Ex. 5—Order holding Lazarus in contempt on March 10, 1967.
    Ex. 6—Transcript of grand jury proceedings on October 18, 1967.

3. We examine the record, to ascertain what objections were made to the reading of the transcripts of appellant's appearances before the grand jury.
    On the day the trial started, appellant's counsel requested the court "to order both parties to make no reference to the fact that Mr. Lazarus, during his testimony in front of the grand jury, took the Fifth Amendment several times and even took it after being granted immunity by the government." [Tr. page 9]. The government argued the transcripts were admissible but the court said, "I can't go along with your theory." [Tr. page 12].

No grounds constitutional or otherwise were stated or argued by appellant.
    After the jury was impaneled government counsel again raised the question and urged that the jury should know that appellant had been given immunity. [Tr. pages 31–32]. Defense counsel then stated:
    "The vice of that you know is that if the fact he had been granted immunity is brought to the attention of the jury they will obviously know prior to that he took the Fifth."

The court reserved ruling and instructed counsel not to mention the matter in the opening statement [Tr. pages 32–33].
    Later the government offered the order signed by Judge Hauk granting the appellant immunity in his testimony before the grand jury.

"Mr. Call (defense counsel) we object on the same ground previously stated." "* * * Any evidence that he took the Fifth Amendment, any evidence he was granted immunity is highly prejudicial and has only little probative value in this case." [Tr. pages 77–78]. No other ground had been previously stated. The objection was sustained. [Tr. 79].

The grand jury transcripts had been made available to appellant's counsel before they were read to the jury. There were questions asked and answered in the transcripts of Dec. 14, 1966, Mar. 9 and 10, 1967, to which no objection or claim

of privilege was made, and about which no question of admissibility was involved.

Counsel for appellant had the opportunity to ask the court to delete those portions where appellant took the Fifth Amendment but he did not do so. However, he requested other portions to be deleted and the court granted his request. [Tr. 86, 138, 161].

Next the first portion of appellant's testimony before the grand jury on October 18, 1967 [Ex. 6] was read to the jury. In the portion read there was no reference to the appellant's claim of his privilege under the Fifth Amendment, or the subsequent order requiring him to answer, or the order holding him in contempt. [Tr. 140 et seq.]

There followed a discussion as to the witness Weisberg who was granted immunity and as to the reading of the transcript of his appearance before the grand jury [Tr. 284–289]. Defense counsel stated, "Our position is the same", but he stated in response to the court's question, that he had no authorities [Tr. 288]. After the noon recess the defense counsel cited Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 [Tr. 290]. The court appeared to think he was talking about the problem of Weisberg. Counsel stated, "I am talking about the immunity problem of Mr. Lazarus." [Tr. 291].

Government counsel then specified additional pages and lines of the transcript of 10/18/1967 he proposed to read [Tr. 379] and read them without objection from the defense. This was additional testimony of Lazarus before the grand jury. There was no mention of the claim of the Fifth Amendment or of the order granting him immunity, or of the order holding him in contempt.

The court then ruled that the government on the issue of wilfullness could use the earlier transcripts to show that appellant refused to testify before the grand jury; that he was granted immunity and went to jail instead of testifying until October 1967. To the court's inquiry as what defense counsel thought of the ruling, Mr. Rosen replied, "If that's the court's ruling so long as my agreement doesn't override my objection." [Tr. 438–39]. Up to this time the only objection made had been "highly prejudicial" and "little probative value."

Following the court's ruling that the transcripts of 12/14/66 and 3/9 and 3/10, 1967, and the remaining portions of the transcript of 10/18/67 could be read, defense counsel specified a portion he claimed was objectional because it

assumed facts not in evidence. [Tr. 440–1]. The court reserved ruling. The following morning the reading of the transcript of 12/14/66 proceeded. The matter assigned as objectionable was omitted. [Tr. 450]. No request was made by appellant's counsel that the particular portion pertaining to the claim of privilege, not be read. Appellant's counsel of course, was entitled to rely on the fact that the court had overruled his objection. But the record clearly shows the limited scope of that objection.

The government then moved the introduction into evidence of Exhibits 1 through 5. [See note No. 2].

"Mr. Rosen (defense counsel) * * * The defendant renews the objection." The court overruled the objection. [Tr. 510–11] and Ex. 1, 2 and 3 were admitted. Ex. 4, an application and order granting immunity and Ex. 5 an order finding Lazarus in contempt of court were then admitted.

The transcript of 12/14/1966 was read without further objection. [Tr. 514–522]. Next was read without further objection Ex. 4, the order of Judge Hauk directing appellant to answer questions and granting appellant immunity; and Ex. 3 concerning the questioning before the grand jury on Mar. 10, 1967 following the grant of immunity, where appellant again refused to testify.

Without further objection, Ex. 5, the contempt order of Mar. 10, 1967, was read [Tr. 534]. Next without further objection Ex. 6, the remaining proceedings before the grand jury on Oct. 18, 1967 were read. [Tr. 551].

No motion to strike or for a mistrial was then made. [Tr. 551]. Following the noon recess the following occurred:

"Mr. Rosen (defense counsel) A motion for a mistrial * * * on the ground that having once again, when reading from the transcript of the testimony of Mr. Lazarus, once again the Cosa Nostra and Mafia were mentioned as he read to the jury." [Tr. 572]. The motion was denied. We have considered the problem concerning the reference to the Mafia in Part I of the opinion.

After the government rested its case [Tr. 602] appellant's counsel moved for a judgment of acquittal on the ground that a prima facie case was not proved as to each count of the indictment. [Tr. 603]. No mention was made of the reading of portions of the transcript. The ruling was reserved and later denied. No motion for mistrial was made.

After offering certain stipulations in evidence the appellant rested. [Tr. 630].

reading of the transcripts (1) would be "highly prejudicial" and (2) have "slight probative value." These are the objections counsel refers to in the record when he refers to the "same objection" or "renews his objection." In the motion for new trial the reading of the transcripts are assigned as error but no grounds, constitutional or otherwise, were set forth.

In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) the defendant did not assert his constitutional privilege until his motion for new trial. [page 27, 89 S.Ct. 1532]. The court remarked it "would have been preferable for petitioner to have asserted the privilege at the trial * * *.". But in *Leary* the defendant, on his motion for new trial, did finally raise the constitutional question. Moreover in Leary the trial occurred before Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v.

United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). In our case the trial was long after Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L. Ed.2d 931 (1957), the principal case relied on by appellant.

In United States v. Scott, (9 Cir. Mar. 6, 1970) 425 F.2d 55, there was a "solid wall of authority" against the constitutional claims which excused the defendant's failure to raise them. Meadows v. United States, (9 Cir. Dec. 23, 1969) 420 F.2d 795 presents the same situation.

■ No motion for a mistrial on any constitutional grounds was ever made. The only motion for mistrial which was made was directed to the reference to the Mafia in the reading of the transcript and not to the reading of the transcript itself. [Tr. 572]. A defendant should not be allowed to by-pass the requirement of Rule 51, Fed.R.Crim.P.,

No motion for a mistrial or further objections were made at the end of the evidence and before the case went to the jury.

Instructions to the jury had been previously settled. No objections were made to the instructions after they were given. [Tr. 753].

The court instructed, "A false statement that is the result of honest mistake is not perjury. If the answers given by the defendant were inadvertently or carelessly made, or if the defendant was mistaken as to the meaning of the question, it is not perjury. In this connection the language used by the defendant must be considered in the light of his education, intellectual and environmental background." [Tr. 747].

Ex. 1, 2, 3, 4 and 5 were not allowed to go to the jury. The court made clear that only the portions read were in evidence.

Following the verdict of guilty on April 9, 1968 [Tr. 762] the appellant on May 6, 1960 filed written motions for judgment of acquittal and for a new trial. [Clk. Tr. 83 and 94]. The motion for acquittal concerned only the evidence. The motion for a new trial contained in point #7 the following:

"The court erred in admitting into evidence the transcript of prior testimony before the grand jury of the

defendant, wherein he declined to answer questions on the ground that it may tend to incriminate him."

No reasons for the error were specified. [Clk. Tr. 83–84].

At the time fixed for the argument on the motion for new trial and for sentence, defense counsel stated:

"And then, over objection, counsel was reading a portion of the grand jury events regarding Mr. Lazarus' refusal to answer questions at a prior grand jury hearing, and in that transcript there was again a reference to the Cosa Nostra and/or the Mafia." [Tr. 775].

And further:

"I would also like to urge upon the court consideration on the motion for new trial as to counts One, Four, and Seven, the reading of Mr. Lazarus' prior testimony, wherein he had taken advantage of the constitutional privilege to refuse to answer on the ground it would tend to incriminate him." [Tr. 777].

"I don't suggest and I have no authority, that perhaps the question of his immunity may have been presented to the jury to show the totality of the circumstances of the element of wilfullness, but not his prior invocation of constitutional privilege, as set forth in the Grunewald case." [Tr. 779].

that he state his objections and the grounds therefor, and to by-pass a motion for a mistrial, and then, after the verdict turns out to be one of "guilty," raise his objection. Devine v. United States, (9 Cir.1960) 278 F.2d 552, 556. The real concern of counsel for appellant was the reference to the Mafia and Cosa Nostra in the grand jury transcripts as shown by his motion for mistrial. [Tr. 572].

(b) *Appellant Did Not Show Below Nor Does he Show Here How he Suffered any Prejudice.*

■ Appellant did not spell out to the trial court and does not tell us on appeal how he was prejudiced by the fact that the jury knew he had previously refused to answer questions on his lawful claim of the Fifth Amendment privilege. No error is claimed in the briefs as to the introduction of the order requiring appellant to answer questions or the order holding him in contempt until he answered, nor to the reading of the portions of transcript of October 18, 1967, in which he testified as to why, after being held in contempt, he decided to answer the questions and secure his release from jail. Appellant, as noted later herein, apparently wanted the evidence as to the time spend in jail to be before the jury.

The grand jury transcript of October 18, 1967, which contained the perjured statements, and to which no objection was made, painted a sorry picture of appellant. He admitted his occupation was gambling and had been such since 1945, but stated that he had never "accepted a wager" since World War II. He claimed no other occupation. He named one bookmaker Zion, as the only person with whom he had placed a bet. He had known Chris and John Prokos of Miami for 18 to 20 years but never heard they were bookmakers; that he had made personal bets with them at sporting events, "head to head" bets, but without "bookmaker's odds or vigorish." He denied making calls to the Prokos brothers from Palm Springs in October 1965 and

did not know if anyone else made calls. It was the records seized at the Prokos Brothers warehouse in Miami that tied appellant into placing bets with them and owing them a substantial sum of money. The record shows how the business of bookmaking is carried on.

Appellant had competent counsel and trial strategy could well have dictated that the jury know that appellant had already served from March 1967 to October 1967 (7 months) for contempt of the trial court's order to testify. These facts were all spread out in the transcript read to the jury together with appellant's statement that he had wanted to testify earlier than October 1967, but his attorney was not available. [Tr. 550–551]. The record showed that appellant had well paid by the 7 months imprisonment for his contempt in refusing to answer. Having this before the jury was probably thought to be important by the defense.

Exhibit 3 was the transcript of proceedings in the district court on March 9, 1967, wherein the district court granted Lazarus immunity and ordered him to answer the questions; and the proceedings in the district court on March 10, 1967 when Lazarus was held in contempt and committed to jail. Exhibit 4 was the order granting immunity and Exhibit 5 was the order of contempt.

Lazarus in his brief does not complain of this evidence and note No. 3, supra, shows that on the offer of these Exhibits into evidence counsel stated only "The defendant renews the objection." [Tr. 510–11]. The only prior ground of objection had been "highly prejudicial and * * * little probative value." [Tr. 77–8].

From Exhibits 3, 4 and 5 the jury knew Lazarus had claimed his privilege against answering questions, had been granted immunity, had again refused to answer the questions and had been jailed for contempt. The claims of privilege on December 14, 1966 and March 9, 1967, added nothing of significance to the evidence from Exhibits 3, 4 and 5. We cannot see how in this setting, the

fact that the jury knew of the prior claims of privilege on the two earlier dates, could have had any impact on the jury or to have in any way affected their verdict. The error if any, was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

(c) *The Grunewald Case is Not Controlling.*

Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) is urged upon us as controlling. We do not have occasion to consider any constitutional problems arising under *Grunewald*, since as shown, the constitutional question was not raised below. In addition, the prior transcripts were offered as relevant to the issue of intent, a matter not considered in *Grunewald*.

In *Grunewald*, the defendant's prior claim of his Fifth Amendment privilege was used to impeach the defendant as a prior inconsistent statement. Not so here. Next the court held the prior invocation of the privilege was proper and was not in fact inconsistent with the defendant's testimony at trial. [page 419–424, 77 S.Ct. 963]. No such claim of inconsistency was made here.

It is contended that counsel for the Government argued to the jury that the claim of the privilege by the appellant was inconsistent with his subsequent testimony. We do not so read the record. The argument stressed the willfulness inherent in a deliberate attempt to shield others and to avoid the sanctions of the contempt order. No objection to the argument was made in the court below and cannot now be raised. Devine v. United States, supra.

### III

Admission of the Bookmaking Records

■ Lazarus was convicted of counts 1, 4 and 7 and received concurrent sentences. The bookmaking records which were offered in evidence concerned only counts 4 and 7. The subject of count 1 was Lazarus' testimony that he did not use the telephone in the Palm Springs house, and that he did not see anyone else do so. Since we hold the conviction good as to count 1, there is no occasion to examine the problem of the bookmaking records as to counts 4 and 7, on which concurrent sentences were imposed.

Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) does not undermine the concurrent sentence doctrine. United States ex rel. Weems v. Follette, (2 Cir.1969) 414 F.2d 417; United States v. Barsaloux, (5 Cir.1969) 419 F.2d 1299. See, Keith v. United States, (9 Cir. 1970) 421 F.2d 1295.

We find no merit in appellant's final contention that there was error in the denial of his motion for a judgment of acquittal.

The judgment is affirmed.