472 A.2d 1027

**Robert Lee MYERS**

v.

**STATE of Maryland.**

**No. 764, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 4, 1984.

Certiorari Denied Aug. 20, 1984.

Michael R. Braudes, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Thomas E. Hickman, State's Atty. for Carroll County, and Frank D. Coleman, Asst. State's Atty. for Carroll County, on the brief, for appellee.

Argued before GILBERT, C.J., and BLOOM and GETTY, JJ.

GILBERT, Chief Judge.

Robert Lee Myers (Myers), the appellant, was convicted by a jury in the Circuit Court for Carroll County (Burns, J.) of murder in the first degree. Myers was sentenced to imprisonment for the balance of his natural life.

Apparently believing there is a corollary between the length of the trial and the number of issues to be raised on appeal, Myers assails the judgment of the circuit court in seventeen different ways. After setting forth the facts from which the judgment grew, we shall discuss each of Myers's many contentions in the order raised by him.

## The Facts

Mary Ruth Myers (Mary Ruth) was employed by Maryland Business Service, an accounting firm owned by her husband, the appellant. When Mary Ruth did not report for work on August 29, 1979, some of her co-workers became concerned and drove to her residence where they found her body in the bedroom. She had been shot nine times.

Approximately two years later the Carroll County Grand Jury indicted Myers, Daniel Chadderton, and Ernestine Marco Myers (Tina) for the murder. The State charged that Myers paid Chadderton $10,000 to kill Mary Ruth. Tina, the person who arranged the meeting between Myers and Chadderton,[1] was also charged, but the charges against her were *nol prossed* in exchange for her testimony inculpating Myers and Chadderton.[2]

---

**1.** There is evidence in the record to the effect that Tina had previously employed Chadderton to "rough up" somebody.

**2.** Chadderton was convicted in the Circuit Court for Garrett County of the murder of Mary Ruth. On appeal, that conviction was affirmed. *Chadderton v. State,* 54 Md.App. 86, 456 A.2d 1313 (1983), *cert. granted,* 296 Md. 172 (1983), but subsequently dismissed as "improvidently granted." 298 Md. 421, 470 A.2d 1269 (1984).

Tina testified in the instant case that Myers desired to have Mary Ruth killed because he detested her, and she was too "expensive." Tina introduced Myers to Chadderton, and on August 23, 1979, Myers agreed to pay to Chadderton $10,000 to slay Mary Ruth.

Myers opted not to testify in his own behalf. Through his attorney, however, he argued to the jury that he was unaware of any scheme to murder Mary Ruth. Myers's counsel urged the jury to believe that Tina, motivated by her desire to marry Myers, was the force behind the homicide. Transpicuously, the jury believed the prosecution's version of the offense. After sentencing, this appeal followed.

## I.

"The trial court erred in refusing to instruct the jury with regard to the defense of voluntary intoxication."

■ In *State v. Gover*, 267 Md. 602, 607–608, 298 A.2d 378, (1973), *aff'g* 15 Md.App. 163, 289 A.2d 601 (1972), Judge Digges, speaking for the Court of Appeals, said:

"We hold that voluntary drunkenness can be a defense to a specific intent crime, but the degree of intoxication which must be demonstrated to exonerate a defendant is great. Evidence of drunkenness which falls short of a proven incapacity in the accused to form the intent necessary to constitute the crime merely establishes that the mind was affected by drink so that he more readily gave way to some violent passion and does not rebut the presumption that a man intends the natural consequence of his act."

The State proceeded against Myers on the basis that he was an accessory before the fact to the murder of his wife in that he procured Daniel Chadderton to perform the actual killing in exchange for the payment by Myers to Chadderton of $10,000. Tina testified that the contract to kill the decedent was entered into at a meeting between Myers, Chadderton, and herself at approximately 1 a.m. on August 23, 1979. Myers points to the following direct testimony of

Tina as that which generated the issue of voluntary intoxication:

"[Prosecutor]: And at the time you met Chadderton at Pantry Pride and introduced Myers and Chadderton, . . .
[Tina] Yes?
[Prosecutor] . . . Was drinking going on then?
[Tina] Yes.
[Prosecutor] Were you all intoxicated?
[Tina] Not falling down. I mean, we had been in much worse shape than that."

Myers contends that in light of that and additional testimony concerning his propensity to imbibe alcohol, the jury could easily have concluded that he was intoxicated at the time of the agreement with Chadderton.

■ We reject appellant's argument for two reasons. First, the evidence of intoxication pointed to by appellant does not satisfy the *Gover* test. "The degree of intoxication necessary to negate *mens rea* is great and is comparable to that degree of mental incapacity that will render a defendant legally insane." *Johnson v. State,* 292 Md. 405, 425 n. 10, 439 A.2d 542 (1982). Tina's testimony relative to Myers's intoxication would not permit a jury reasonably to conclude that he lost control of his mental faculties to such an extent as to render him unable to appreciate the consequences of his actions. Second, even if there were evidence sufficient to show that Myers was so intoxicated at the time of the agreement with Chadderton as to lack the mental faculties necessary to comprehend what he was doing, there is no evidence that he remained similarly intoxicated from the time of the making of the agreement until the murder of Mary Ruth six days later.

As we see it, the issue was not fairly generated by the evidence, and the trial judge properly refused to instruct the jury on voluntary intoxication. *Tripp v. State,* 36 Md.App. 459, 374 A.2d 384 (1977); *Evans v. State,* 28 Md.App. 640, 349 A.2d 300 (1976), *aff'd* 278 Md. 197, 362 A.2d 629 (1976).

## II.

"The trial court erred in refusing to order that the defense be provided with the transcript of the proceedings before the Grand Jury."

■ Myers avers that the trial judge violated the rule established in *Jones v. State,* 297 Md. 7, 464 A.2d 977 (1983), when he failed to grant Myers's pretrial motion to inspect, for potential cross-examination purposes, the grand jury testimony of witnesses.

■ This Court, in *Silbert v. State,* 12 Md.App. 516, 523, 280 A.2d 55 (1971), said, "While there is no absolute right to inspect grand jury testimony, . . . a criminal accused may, in a proper case, be afforded access to grand jury minutes if he demonstrates a 'particularized need' for disclosure, . . . ." (Citations omitted.) A "particularized need" has remained the Plimsoll line for the trial judge in determining whether a request to inspect grand jury minutes should be granted. *Jones v. State, supra; Erman v. State,* 49 Md.App. 605, 434 A.2d 1030 (1981), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982); *Green v. State,* 25 Md.App. 679, 337 A.2d 729 (1975); *Sutton v. State,* 25 Md.App. 309, 334 A.2d 126 (1975).

Ere *Jones v. State, supra,* what did or did not pass the Plimsoll mark depended on the facts of each case. *Jones* clearly delineated when a particularized need is shown. Judge Couch wrote for the Court in *Jones,* "that *after* a State's witness had testified in chief, the accused was entitled to see that witness's transcribed grand jury testimony for use in cross-examination which was a 'particularized need,' without any further showing of need." (Emphasis supplied.) 297 Md. at 24, 464 A.2d 977. (Per Curiam opinion on motion for reconsideration).

Not once "*after* a State's witness had testified in chief" did Myers move to inspect the grand jury testimony of the witness. Myers's motion to inspect the grand jury testimony was made prior to the trial and was grounded on the theory that potential impeachment of a witness always

amounts to a showing of particularized need. *Jones* does not stand for that proposition. While Jones did file a pretrial motion to inspect the grand jury testimony of the principal State witness, he did not raise the denial of that motion as an issue on appeal, and the Court did not address it. *See* 297 Md. at 10, 464 A.2d at 977.

A pretrial motion to inspect the grand jury minutes of testimony of potential trial witnesses, in order to cross-examine or impeach those witnesses at trial, does not seem to show a particularized need.

In *Jones* the Court stated the dilemma before it thus: "The problem is what does a defendant have to offer to demonstrate a 'particularized need,' keeping in mind that until a witness's grand jury testimony is disclosed, there is no way a defendant can determine whether such testimony varied from the trial testimony so as to be of any use on cross-examination." 297 Md. at 13, 464 A.2d 977. The Court went on to say that:

"[I]n the usual situation, without seeing the grand jury testimony first, a defendant would be incapable of showing a more detailed particularized need [other than an allegation that 'a litigant seeks to use the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like.' *United States v. Procter & Gamble,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) ]. *Accordingly, we hold that after a State's witness has testified on direct examination, a defendant is entitled to inspect the grand jury testimony for cross-examination purposes without any requirement that he show any other need."* [3] (Emphasis supplied.) 297 Md. at 14–15, 464 A.2d 977.

Although the Court had the opportunity to pass upon the pretrial right *vel non* of a defendant to obtain a transcript

---

**3.** Patently, if grand jury testimony is not recorded in some fashion, it cannot be examined irrespective of when the witness testifies. *Jones* did not hold that grand jury testimony *must* be recorded.

of grand jury testimony for possible use at trial to impeach a witness, refresh his recollection, test his credibility "and the like," it did not directly do so. Implicit in the *Jones* holding, however, is that the particularized need to examine the grand jury testimony of a State's witness is not triggered until the witness has testified on direct examination in the trial.

Inasmuch as Myers failed to renew his motion at the proper time, that is, after the State's witness testified in chief, he has waived his right to complain. *Jones v. State,* 297 Md. at 14–15, 464 A.2d 799.

### III.

"The trial court erred in striking prospective juror Hallman for cause."

■ Myers contends that Judge Burns violated the rule established in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), when he excused Thomas Hallman from the jury for cause, and that the remedy for that error is reversal of the conviction.

*Witherspoon* held that the death penalty cannot constitutionally be imposed if the jury that recommended it was chosen in a manner that excluded veniremen for cause simply because they expressed general objections to capital punishment or voiced religious or conscientious scruples against it.[4] Nearly one-half of the *Witherspoon* veniremen were stricken because they expressed qualms about the death penalty. The jury that was ultimately selected convicted Witherspoon and recommended he be executed. The United States Supreme Court reversed the sentence, but upheld the conviction. The Court held that the State produced a jury that was uncommonly willing to condemn a man to death. Thus, the State violated the accused's consti-

---

4. Left untouched by the holding in *Witherspoon* was the State's right in a capital case to exclude from the jury those who say they could never vote to impose the death penalty or those who would refuse to consider its imposition in the case before them.

tutionally guaranteed right to a jury randomly selected from a representative cross-section of the community. The Court, however, opined that it could not conclude either on the basis of the record before it, or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment resulted in an unrepresentative jury on the issue of guilt or substantially increased the chance of conviction. The Court said that it was not prepared to announce a *per se* constitutional ruling requiring the reversal of every conviction returned by a jury selected in a manner similar to that in *Witherspoon.*

■ There appears to be a uniformity in holding by the courts that an erroneous exclusion of a juror in violation of the test announced in *Witherspoon* does not militate against the validity of the finding of guilt. *See e.g. Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Lewis v. Oklahoma,* 304 F.Supp. 116 (W.D.Okla. 1969); *Brinks v. State,* 44 Ala.App. 601, 217 So.2d 813 (1968), *cert. denied,* 283 Ala. 712, 217 So.2d 820 (1968); *Clark v. Smith,* 224 Ga. 766, 164 S.E.2d 790 (1968), *rev'd on other grounds,* 403 U.S. 946, 91 S.Ct. 2279, 29 L.Ed.2d 859 (1971). Because the sentence imposed on Myers was life imprisonment, his *Witherspoon* issue fails even if the exclusion of the juror were deemed to be error.

### IV.

"The trial court erred in striking prospective juror Quinn for cause."

Myers asseverates that a prospective juror, Eileen A. Quinn, was erroneously stricken for cause. Ms. Quinn said that while she felt "very strongly about" the death penalty and had earlier been philosophically opposed to it, she nevertheless thought she could vote to impose it. Even if we assume that the trial court erred in striking the juror, that error will not mandate reversal. Our discussion in part III above is dispositive of the matter.

## V.

"The trial court erred in admitting evidence of other crimes and bad acts."

The Court of Appeals in *Ross v. State,* 276 Md. 664, 669–70, 350 A.2d 680 (1976), said:

"The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible . . . . This principle is merely an application of the policy rule prohibiting the initial introduction by the prosecution of evidence of bad character. Thus, the state may not present evidence of other criminal acts of the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.' C. McCormick, Evidence § 190 (2nd ed. 1972).

. . . .

There are exceptions to this general exclusionary rule which, perhaps, are equally well-recognized. Thus, evidence of other crimes may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial."

Myers points to four rulings relative to "other crimes." Those rulings, he says, constitute reversible error. We shall discuss each of them in the same order that Myers has presented them to us.

### *"Assault upon Dana Abbott"*

■ Melvin Ray Keith, Jr., who dated Myers's stepdaughter, Dana Abbott, from 1976 through 1979 testified that

sometime before the murder of Mary Ruth, Myers had an argument with Dana during which Myers placed his hands around Miss Abbott's neck. The act produced a red mark on her neck. Myers objected to that testimony on the basis of its lack of relevance. The state's attorney proferred that the evidence was relevant to confirm that Myers did not want Mary Ruth's children in the house and that he had "to put up with them as long as Mary Ruth Myers was alive." We think the testimony was tenuous and irrelevant, and should not have been admitted. The testimony is in direct violation of *Ross,* since it did not fall into any of the five recognized exceptions.

A minor assault on his stepdaughter, Dana Abbott, eighteen months prior to the murder of Mary Ruth Myers, Miss Abbott's mother, does not translate into a motive to kill the mother, nor does it constitute a "common plan." The connection between the two events is so unrelated that it is almost inconceivable that the prosecution would jeopardize its case by presenting such irrelevant testimony. We hold that the admission of that testimony was clear error.

Our holding, however, provides Myers with little or no solace, because we deem the error was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). We think the jury was not misled by the dubious connection between the aged minor assault on the stepdaughter and the murder of the mother. In light of the other evidence adduced at the trial, the revelation of the "assault upon Dana Abbott" pales into insignificance. *Dorsey v. State, supra.*

### *"Plans to Commit Future Murders"*

■ The State's principal witness, Tina Myers, was asked on redirect examination to explain her earlier remark that Myers "was not the goody-two-shoes that everyone thinks he is." The transcript reveals:

"Q. What did you mean by that?

A. It wasn't just Mary Ruth that he wanted killed.

Q. Why do you say that?

A. Because I overheard Dan [Chadderton] and Bob [Myers] discussing to kill Corporal Leete and yourself, and two others."

At that point appellant's counsel objected and moved for a mistrial. The judge instructed the jury to disregard Tina's testimony concerning Myers's plans to commit future murders. The curative instruction was adequate, and we have been shown nothing to cause us to believe the jury failed to heed the court's instructions. Consequently, we perceive no abuse of discretion by Judge Burns in refusing to grant a mistrial. *James v. State,* 14 Md.App. 689, 288 A.2d 644 (1972); *Gerstein v. State,* 10 Md.App. 322, 270 A.2d 331 (1970), *cert. denied,* 402 U.S. 1009, 91 S.Ct. 2191, 29 L.Ed.2d 431 (1971); *Parker v. State,* 7 Md.App. 167, 254 A.2d 381 (1969), *cert. denied,* 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 150 (1971); *Matthews v. State,* 3 Md.App. 555, 240 A.2d 325 (1968).

*"Insurance Fraud"*

■ Over the objection and denial of a motion for a mistrial, the State introduced evidence that in September, 1979, Myers reported to an insurance carrier that certain items of jewelry belonging to Mary Ruth had been stolen, when in fact they had not. The prosecution's theory of the admissibility of that evidence was that Myers planned the murder of Mary Ruth to be carried out so that it appeared as if there had been a robbery, and reporting of the items as stolen was in furtherance of the murder plan. The evidence, in our view, was relevant to show an attempt by Myers to cover up the crime. We perceive no error.

*"Sexual Misconduct on 'The Block'"*

■ Ronald Frampton testified, over objection, concerning Myers's "sexual activity with women on The Block."[5]

Frampton's testimony was a repetition of similar evidence that had been admitted without objection.

In *Forrester v. State*, 224 Md. 337, 343–344, 167 A.2d 878 (1961), the Court said:

"[I]t is not reversible error to overrule an objection to inadmissible testimony if the witness had previously testified to the same effect without objection . . . ."

Although *Forrester* dealt with testimony by the *same* witness, we think its rationale applicable when prior witnesses have testified without objection to the same thing substantially to which the objection is interposed. In any event, the admission of what was cumulative testimony, even if error, was harmless beyond a reasonable doubt, *Dorsey v. State, supra.*

Myers, without discussion, points us to two other instances in which he alleges that the rule of *Ross v. State, supra,* was violated. In one, he objected on a ground different from that posed to us, hence it is not before us. Md.Rules 522 and 761. The other involved an Internal Revenue Service audit. Judge Burns properly sustained an objection and instructed the jury "to completely disregard . . . it, strike it out, block it out of your head . . . ." That ruling and instruction cured any error.

## VI.

"The trial court erred in refusing to grant a mistrial as a result of the improper closing argument of the state's attorney."

▇ Judge Burns, Myers claims, abused his discretion when he refused to grant a motion for mistrial bottomed on the alleged improper closing argument by the prosecutor. During that argument, the prosecutor twice made statements which could be viewed as an attempt to bolster the

---

5. An area in Baltimore City in which a number of so-called adult entertainment establishments are located.

credibility of Tina by placing his own credibility in issue. Moreover, he implied that Judge Burns's ruling with respect to a particular evidentiary point was erroneous. The prosecutor overstepped his bounds, and Judge Burns properly and promptly admonished him in the presence of the jury. Additionally, the judge immediately instructed the jury to disregard the state's attorney's improper comments.[6]

The law is well settled that the decision of whether to grant a mistrial is vested in the sound discretion of the trial judge and will only be disturbed on appeal where there has been an abuse of that discretion. *Collins v. State,* 14 Md.App. 674, 288 A.2d 221 (1972), *cert. denied,* 409 U.S. 882, 93 S.Ct. 169, 34 L.Ed.2d 137 (1972); *Gerstein v. State, supra; Parker v. State, supra.*

> "The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party." (Emphasis in original) *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974).

We are convinced the trial judge's prompt and forceful interdiction against the ill-considered remarks of the prosecutor was sufficient to remove the possibility of injury to Myers. Particularly apposite is the *Wilhelm* statement that:

> "When in the first instance the remarks of the State's Attorney do appear to have been prejudicial, a significant factor in determining whether the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused is whether . . . the trial court took any appropriate action, as the exigencies of the situation may have appeared to require, to overcome the likelihood of prejudice, such as informing the jury that the

---

6. "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." ABA Standards, The Prosecution Function § 5.8(b) (1971).

remark was improper, striking the remark and admonishing the jury to disregard it. When such action has been taken by the trial court and found to have been sufficient by the reviewing court, the judgments have not been reversed." 272 Md. at 423–424, 326 A.2d 707.

Judge Burns, the person in the best position to adjudge whether to grant a mistrial, obviously believed that his curative instruction erased the deleterious effect of the prosecutor's unwise remarks. We think the judge's instruction overcame the likelihood of prejudice to Myers, and, thus, no error was committed in denying the motion for a mistrial.

## VII.

"The trial court erred in failing to strike prospective juror Curran for cause."

During jury selection proceedings, Judge Burns denied Myers's request that prospective juror Curran be excluded for cause. Subsequently, before Myers was called upon to exercise peremptory challenges, the State and Myers jointly moved to excuse Curran, and the judge granted the motion. Inasmuch as Curran was excused from the panel, the question of whether he should have so been removed when the matter was first raised is mooted. This issue is patently frivolous, and why it has been raised on appeal eludes us, unless it is to demonstrate that Don Quixote is not the only one to tilt at windmills.

## VIII.

"The jury that tried appellant was improperly selected."

The State, as we have previously observed, sought the imposition of the death penalty in the event Myers was convicted of murder in the first degree. Judge Burns, following the holding in *Witherspoon v. Illinois, supra,* excluded from participation on the jury all persons who expressed the view that they could never vote to impose capital punishment. Myers asserts that "the exclusion of all

persons who could never impose the death penalty resulted in a jury at the guilt-innocence phase which was 'prosecution prone' and not drawn from a fair cross-section of the community."

That argument was rejected by this Court in *Chadderton v. State*, 54 Md.App. 86, 456 A.2d 1313, *cert. granted*, 296 Md. 172 (1983), and then denied as improvidently granted.

In *Chadderton* we said:

"In *Witherspoon*, the petitioner had argued that there is ' "competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence." ' 391 U.S. at 517, 88 S.Ct. at 1774. The Supreme Court disposed of this assertion by stating that

'The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.' 391 U.S. at 517–518, 88 S.Ct. at 1774–1775.

Counsel for appellant sets out in his brief various studies which he contends have updated the data which the Supreme Court found to be 'too tentative and fragmentary'; and on the basis of these studies and findings contends that data to support his proposition regarding jury selection are no longer tentative or fragmentary as found by the Supreme Court in *Witherspoon*. We have reviewed the data submitted by appellant and considered his discussions and arguments in support of his thesis. It is our opinion, however, that they do

not invalidate or undermine the findings of the Supreme Court in its *Witherspoon* holding." 54 Md.App. at 89, 90, 456 A.2d 1313. (Footnote omitted.)

*Chadderton* is dispositive of the issue.

## IX.

"The testimony of Tina Myers should have been excluded because of her status as an approver."

■ Myers grounds his argument on Md.Ann.Code art. 27, § 635, which provides, "an approver shall never be admitted in any case whatsoever . . . ." That legislative mandate has its origin in Laws 1809, ch. 138, § 10.

■ An approver, according to *Oliver v. State,* 53 Md. App. 490, 501, 454 A.2d 856 (1983), "is one who brings *formal charges against and privately prosecutes,* his accomplices." In the instant case Myers was accused by the Grand Jury of Carroll County, not by Tina Myers, and of more import, there are in Maryland no private prosecutions. All prosecutions are conducted by and on behalf of the State.

That the charges against Tina, an indicted accomplice, were *nol prossed* as the *quid pro quo* for her testimony implicating Myers does not convert Tina into an approver. *Oliver v. State, supra.* Md.Ann.Code art. 27, § 635, makes it crystalline that the practice of approvement is not permitted in Maryland. The statute, however, "is not authority for holding that the testimony of an accomplice is not admissible against those with whom he was associated in a criminal act." *Calhoun v. State,* 297 Md. 563, 589, 468 A.2d 45 (1983).

## X.

"The trial court erred in refusing to permit defense counsel to question Tina Myers with regard to her knowledge of murders in Nevada."

■ During the cross-examination of Tina, Myers's counsel proffered that he desired to ask Tina about statements she made to Myers that while she was living in Nevada she

had been involved in or had knowledge that individuals were taken into the desert, murdered, and buried. The State objected to that type of cross-examination, and Judge Burns sustained the objection. Myers asserts that the evidence was the proper subject of cross-examination because it was relevant both substantively and for purposes of impeachment.

Judge O'Donnell wrote for the Court of Appeals in *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976):

"The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue.' . . . [O]ur predecessors stated it to be 'an elementary role that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them.'" (Citations omitted.)

Myers maintains that the proffered evidence was relevant because it would tend to confirm his theory that Tina was the one responsible for the murder of Mary Ruth. Testimony concerning events in Nevada unrelated to the killing of Mary Ruth were clearly collateral, if not irrelevant, to Myers's guilt or innocence. Moreover, a trial judge has broad discretionary authority to exclude even relevant evidence if it has limited probative value but substantial prejudicial effect, such as confusion of issues or undue delay, in the factfinding process. *Blondes v. Hayes,* 29 Md.App. 663, 350 A.2d 163 (1976); 1 Wharton's Criminal Evidence, § 151 (Torcia, 13th Ed.1972). *See also People v. Curtis,* 43 Cal.Rptr. 286, 232 Cal.App.2d 859 (1965); *State v. Slauson,* 249 Iowa 755, 88 N.W.2d 806 (1958).

We think that if the proffered evidence were relevant, its tendency to appeal to the passions and prejudices of the jury to gain their sympathy and to shift the focus from Myers to Tina far outweighed its probative value. *Blondes v. Hayes, supra; State v. Flett,* 234 Or. 124, 380 P.2d 634 (1963). When we say outweighed its probative value, we mean that

such evidence might cause the jury to decide the case on an improper basis, *i.e.,* emotion. C. McCormick, Handbook on the Law of Evidence, § 185 (2d Ed.1972).

 Contrary to the proffer, the evidence was not relevant for impeachment purposes. "A witness generally may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant." *Smith v. State,* 273 Md. 152, 157, 328 A.2d 274 (1974). "[A] witness may be cross-examined about prior bad acts that are relevant to assessing his credibility regardless of whether a conviction resulted." *Robinson v. State,* 298 Md. 193, 197, 468 A.2d 328 (1983). The alleged acts of Tina which Myers sought to probe neither resulted in a conviction nor were probative of her character for veracity. The character trait suggested by the proffered incident relates to her knowledge of alleged violence, not to her credibility.

The record reflects that Tina's credibility was fully inquired into by Myers's attorney. He spread before the jury the seamy side of Tina's reputation, including testimony from her father and uncle that she was dishonest and not to be believed. Tina's son testified that she used to say about herself that she "lied, lied, lied, lied, lied, a whole lot." There was also testimony that Tina had a juvenile record for theft; had engaged in a credit card "flim-flam" in California for which she received a prison sentence; was a prostitute in California; and had lied on several occasions to social welfare agencies regarding her domestic and financial affairs. The latter resulted in a fraud charge which was *nol prossed* when she agreed to testify against Robert Myers. Tina admitted that before becoming a State's witness, she deliberately started a false rumor that the state's attorney had asked her several times for a date. Her purpose in so doing was to cause the disqualification of the prosecutor.

Short of a conviction for perjury, it is difficult to conceive how Tina's reputation could have been further sullied.

## XI.

"The trial court erred in striking a sitting juror in the absence of findings of fact to support that ruling."

■ A prospective State's witness, Glenn Ross, informed Judge Burns that a juror, John Rummer, had discussed the case with Ross at a local restaurant. During an *in camera* hearing before the judge, Rummer admitted talking to Ross, but denied that the case was the topic of conversation. After finding that Rummer had violated the court's instructions not to discuss the case with anyone, the judge removed Rummer from the jury and replaced him with an alternate. The authority of a trial judge to remove a juror who has violated the court's instructions relative to discussing the pending case is not contested by Myers. *See Tisdale v. State,* 41 Md.App. 149, 396 A.2d 289 (1979); *James v. State,* 14 Md.App. 689, 288 A.2d 644 (1972); Md.Rule 751 b. Myers does not even assert that there was a lack of evidence to support Judge Burns's conclusion that Rummer had violated instructions. Rather, Myers avers that Rummer was improperly removed because Judge Burns's ruling was based on a "clear factual error." Myers is technically correct, but flat out wrong pragmatically.

The judge's factual error was that although Rummer denied discussing the case with Ross, the judge mistakenly said that Rummer "admitted" discussing the case. Even though Judge Burns misspoke, the error was unquestionably harmless. Ross testified that Rummer did speak about the Myers case and that testimony, standing alone, if believed, was sufficient to permit the substitution on the jury panel of an alternate in lieu of Ross.

In *Bluthenthal & Bickart v. May Co.,* 127 Md. 277, 285, 286, 96 A. 434 (1915), the Court opined:

> "*The authorities support the proposition that it is not reversible error for the Court of its own motion to exclude a juror, even for insufficient cause, if an unobjectionable jury is afterwards obtained. In Pittsburgh, etc., Ry. Co. v. Montgomery,* 152 Ind. 1, *in discussing an objection such as*

that now under consideration, the Court said: 'It is complained under the motion for a new trial that the Circuit Court erred in excusing on its own motion the juror Overholser, who it is alleged was a competent juror, over appellant's objection. But it is not shown that the jury which was finally impaneled was not a fair and impartial jury. In such a case, the matter is very much in the discretion of the trial Court, and no error is committed where no injury results from the Court's action in excusing the juror . . . . ' " (Emphasis supplied.)

Inasmuch as Myers has not demonstrated that he was prejudiced by the seating of the alternate or that the jury, as finally constituted, was objectionable, *Bluthenthal* is dispositive.

## XII.

"The misconduct of appellant's initial trial counsel, taken advantage of by the State, resulted in an improper interference with appellant's right to counsel or a denial of due process of law."

Myers filed a pretrial motion for "appropriate relief" in which he alleged that the State knowingly "cashed in" on what Myers perceived to be the unethical conduct of Phillip Sutley, Esquire. Sutley, according to Myers, was counsel to both Myers and Tina during the period of time when the "deal" was consummated in which Tina agreed to become a prosecution witness against Myers and Chadderton in exchange for all charges against her being *nol prossed* by the State. Myers asserts that the State abetted what he believes to be Sutley's professional misconduct toward Myers. Based on that premise, Myers argues that the prosecution was so tainted "the conviction must be reversed."

Prior to the time the actual bargain was struck between Sutley and the State, Anton Keating, Esquire, in the role of a public defender, entered his appearance on behalf of Myers. The trial judge heard testimony relevant to Myers's allegation. Although Judge Burns intimated that Sutley

had been confronted by a conflict of interest as between Myers and Tina, the judge said the prosecution was not tainted by that apparent conflict. Judge Burns specifically found "that Phillip Sutley was not a State agent." Additionally, the judge found that even if he assumed *arguendo* "that Sutley was a State agent," then "the State . . . met its burden [of proving there was no taint] by showing that there was no disclosure [to the State] of information received by Sutley from Robert Myers." The judge went on to say:

"Accordingly, . . . there has been no Sixth Amendment violation of Mr. Myers. We are of the further opinion that the entire situation and relationship between attorney Philip M. Sutley and Robert Myers have possibly placed Mr. Myers in a compromising position, but there is no relief available to Mr. Myers in these proceedings before this Court, the Circuit Court for Carroll County. Relief possibly would be available to Mr. Myers in another form or another tribunal.

For those reasons [Myers's] Motion . . . is denied."

While Myers testified to a version of events that was markedly different from Sutley's view, Judge Burns was free to believe the evidence as he saw it. We cannot say that the judge's finding of fact was clearly erroneous. Md. Rule 1086.

Generally speaking, joint representation in criminal cases is fraught with potential conflict of interest. *State v. Hunt,* 26 Md.App. 417, 338 A.2d 95 (1975). "[O]rdinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation." *ABA Standards Relating to the Administration of Justice, The Defense Function,* § 3.5(b) (1971).

Sutley does not appear to have displayed the acmic in professional behavior. Nevertheless, absent a showing that the State tainted Myers's defense, reversal is not dictated.

## XIII.

"The trial court erred in admitting the testimony of Thomas Bowman relating allegedly incriminating statements by Daniel Chadderton."

■ Thomas Bowman testified about an incriminating conversation between Myers and Chadderton that he overheard in March, 1982, while all three were incarcerated in the Garrett County Detention Center. Bowman related to the jury that Chadderton told Myers that Tina is " 'going to have to be shut-up. She's going to have to be taken care of, got rid of,' " before she made a " 'deal' " with the state's attorney. Chadderton, Bowman said, went on to say that he could arrange to have a hired assassin " 'take care of this and shut her up' " if Myers " 'came up with some money, twenty or thirty thousand dollars.' " Meanwhile, according to Bowman, Myers stood by silently and nodded his head up and down. Bowman narrated that he heard Myers interject, " 'I know we shouldn't have gotten into this mess to begin with ... I know we shouldn't have called her there to the house ... I know they'd know it was me.' " Chadderton then allegedly replied, " 'Well, that's the only place I could get a clean shot at her. That's the only place without any witnesses or anything that I could do it.' " Following that remark by Chadderton, Robert Myers, Bowman testified, just looked at Chadderton without saying anything.

At trial Myers objected to the admission of Bowman's testimony as to the Chadderton remarks on the ground that they were "classic hearsay." Myers asserts their admission into evidence violated his federal constitutional right to confront his accuser, that is, the out of court declarant, Chadderton.

"The hearsay rule forbids evidence of out of court assertions to prove the facts asserted in them. Manifestly, proof of utterances and writings may be made with almost an infinite variety of other purposes, not resting for their value upon the veracity of the out of court declarant and hence falling outside the hearsay classification." C. McCormick,

Handbook of the Law of Evidence, § 249 (2nd ed. 1972). The State, in the matter *sub judice,* proffered that Chadderton's remarks were not being offered for the truth of the matter asserted therein, but to show the effect they had on Myers. We think Chadderton's remarks were admissible on the proffered basis to place Myers's responsive conduct in context.

It is well established that testimony as to out of court admissions by a party opponent is substantively admissible under the hearsay exception for such admissions. "Admissions are words *or acts* of a party opponent . . . offered as evidence against him . . . . [T]hey may be classified as *express* admissions . . . or . . . admissions by *conduct* . . . ." McCormick, *supra* § 262. Bowman's testimony concerning Myers's statement was admissible under this hearsay exception, and it is not contended otherwise.

> "If a statement is made by another person in the presence of a party to the action, concerning assertions of facts which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak has traditionally been receivable against him as an admission. . . . Since it is the failure to deny that is significant, an equivocal or evasive response may similarly be used against him . . ., but if his total response adds up to a clear-cut denial, this theory of implied admission is not properly available. . . ." McCormick, *supra,* § 270.

Chadderton's remarks concerning the need to eliminate Tina as a witness were admissible to show Myers's reactions to the assertions. By nodding in the affirmative, Myers adopted Chadderton's remarks as his own. A declaration by an accused that he intends to intimidate or procure the absence from the trial of a State's witness is admissible as evidence of the accused's guilt. *See e.g., State v. Adair,* 106 Ariz. 4, 469 P.2d 823 (1970); McCormick, *supra,* § 273.

Patently, Myers by his silence acquiesced in Chadderton's declaration that the marital residence of Myers and Mary Ruth was the only place he could "get a clean shot at her

[Mary Ruth]." Chadderton's comment was in response to Myers's statement that, "I know we shouldn't have called her there to the house." Chadderton's remark was not offered as proof of the truth of its content, but rather to show, as we have said, Myers acquiescence therein. C. McCormick, *supra* § 270.

Myers was not denied any right of confrontation on the issue of whether Chadderton actually made the statement related by Bowman.

"From the viewpoint of the confrontation clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard." *Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970); *see also McDowell v. State,* 31 Md.App. 652, 358 A.2d 624 (1976).

## XIV.

"The trial court erroneously admitted evidence of the statements and actions of alleged co-conspirators after the accomplishment of the object of the conspiracy."

■■■ Corporal Leete and another Maryland State trooper went to see Chadderton on September 8, 1979, at the latter's place of employment. When asked to describe what occurred during that meeting, Leete said:

"[W]e parked our car directly behind the car of Daniel Chadderton, and when he came out [of his place of employment], we exited the police vehicle. He looked at us, and I in fact asked him if he had a gun in his car, and he replied no. And at that point, without any prompting, he went over and put his hands on my right front fender of my police car and assumed the frisk position."

Myers's counsel promptly objected to Leete's answer on relevancy grounds, but he did not move to strike the response. We agree that the testimony was irrelevant.

Chadderton's assuming the frisk position without prompting might be viewed, *inter alia,* as indicating his prior

experience of having been searched before by law enforcement officers, or knowledge gained from viewing television or motion pictures. Even if we assume, however, that the jury believed that Chadderton's assumption of the frisk position was based on his prior first hand experience in being searched by police officers, the error in admitting the irrelevant evidence was, viewed in the totality of the evidence, absolutely harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. at 638, 350 A.2d 665.

Myers also charges that it was error for the court to admit the testimony of Adam Handschuh. Handschuh told the jury that in September, 1979, when he asked Chadderton if the latter had killed Myers's wife, Chadderton responded, " 'I'm not going back to the slam, but if I do I'm taking two people with me.' And I said, 'who?' And then he just started sipping his coffee."

While it is true that neither Myers, nor Tina, nor Chadderton was charged with conspiracy, the testimony of Tina clearly demonstrated that she, Myers, and Chadderton entered into a conspiracy to slay Myers's wife, Mary Ruth. Tina testified that the same trio conspired to "cover up" their involvement in that murder. The law is clear that the statement of a conspirator, made for the purpose of concealing the crime after the object of the conspiracy has been attained, is admissible against any co-conspirator on trial. Such a statement is admitted as an exception to the hearsay rule. *Mason v. State,* 18 Md.App. 130, 305 A.2d 492 (1973), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974); *Johnson v. State,* 9 Md.App. 327, 342, 264 A.2d 280 (1970); 3 Underhill's *Criminal Evidence,* § 861 (5th ed.). Chadderton's answer to Handschuh may reasonably be interpreted as having been made during the course of the conspiracy of silence after the murder.

## XV.

"The trial court erred in excluding evidence that appellant purchased stock for the victim prior to the homicide."

■ Myers sought to place into evidence stock certificates and securities that were purchased in the name of "Mary Ruth Myers" during the period 1977 through 1979. The State objected to the admission of that evidence, pointing out that there was no testimony concerning who purchased the securities. Myers proffered that the securities in the decedent's name were relevant to contradict the State's theory that he had his wife murdered because divorce would be too expensive. He argued that the jury could conclude that it would be nonsensical for him to permit Mary Ruth to purchase the securities, as sole owner, with his money if he intended to have her slain. The evidence was irrelevant, and there was no error in sustaining the State's objection.

## XVI.

"The trial court erred in refusing to suppress statements by appellant made as a result of contacts initiated by State agents after appellant was represented by counsel."

■ Statements made by Myers to Cpl. Leete and Trooper Mays during 1980 were admitted into evidence. In this Court it is contended that the statements were deliberately elicited from him, notwithstanding that the troopers were aware of the fact that he was then represented by counsel. Therefore, Myers avers that his right to assistance of counsel under the Sixth Amendment and Article 21 of the Maryland Declaration of Rights were violated. To underpin his argument, Myers cites *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), and *Massiah v. United States,* 377 U.S. 201, 74 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

*Brewer* and *Massiah* hold that once adversary proceedings have commenced against the accused, he is entitled to legal representation when the government interrogates him, unless there is a waiver of that right. *Watson v. State,* 282 Md. 73, 382 A.2d 574 (1978), *aff'g* 35 Md.App. 381, 370 A.2d 1149 (1977).

The confrontation in *Brewer* was between the government and the accused after the accused had been arraigned. The

defendant in *Massiah* was indicted before the government elicited incriminating remarks from him. The Sixth Amendment was triggered in both *Brewer* and *Massiah* because formal charges had been brought against the accused before interrogation.

The State disputes that Myers's remarks were intentionally elicited from him, and asserts to the contrary that Myers not only initiated the discussion with Cpl. Leete and Trooper Mays, but volunteered the statements. The State points to the fact that the statements by Myers in question were made in July, August, and September, 1980, more than one year before the November, 1981, indictment.

Irrespective of whether the statements from Myers were volunteered or intentionally elicited, there was no Sixth Amendment violation, *see Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), because Myers was not, at that time, charged with any criminal offense.

"The Sixth Amendment does not apply to 'persons' generally or extend the right to counsel to all situations where such assistance is critically needed or where more affluent persons would have the benefit of such privately retained assistance. *The whole package of Sixth Amendment trial rights is prefaced by the limiting words: 'In all criminal prosecutions, the accused shall enjoy the right . . . .'* Both the notion of 'criminal prosecution' and of 'the accused' limit significantly the right to counsel and all other Sixth Amendment rights." R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure,* § 55 (1983). (Emphasis supplied.)

## XVII.

"The trial court erred in refusing to compel the provision to the defense of Corporal Leete's notes of his interview with Tina Myers concerning the corrections of her statement to the police."

■ The record reveals that Cpl. Leete interviewed Tina in March, 1982, after she became a State's witness, and he

took handwritten notes of her oral statement. The notes were sought to be discovered by Myers. Judge Burns correctly denied Myers's discovery request inasmuch as appellant had no right to inspect those notes. Recently, in *Whitehead v. State,* 54 Md.App. 428, 458 A.2d 905, *cert. denied,* 296 Md. 653 (1983), we rejected a contention similar to the one now raised by Myers. *Whitehead* is dispositive of the issue.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.