## PERRY CLYDE BATEMAN *v.* STATE OF MARYLAND

[No. 6, September Term, 1970.]

*Decided January 7, 1971.*

632

The cause was argued before ANDERSON, MORTON, and MOYLAN, JJ.

*Joseph Casula* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Howard S. Chasanow, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Perry Clyde Bateman, was convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge Ralph W. Powers, of two separate murders in the second degree.

On appeal he raises four contentions:

(1) That the trial court committed reversible error by not instructing the jury on the subject of voluntary intoxication,

(2) That the trial court committed reversible error by not instructing the jury on "heat of passion",

(3) That a question put to a witness by the prosecutor constituted reversible error, and

(4) That the trial court committed reversible error in commenting on defense counsel's closing argument.

At approximately 2:30 a.m. on December 14, the appellant was awakened by a telephone call which turned out to be a call to a wrong number. At that point he discovered that his wife, who had gone out earlier to purchase a six-pack of beer, was not yet at home. He thereupon drove by several taverns in the area as well as the homes of several friends searching for his wife. He then found his wife's car parked on Greig Street in Seat Plea-

sant and upon recognizing the car proceeded up to a second floor apartment wherein he heard his wife's laughter. He stood outside the apartment for a few minutes and then went back to his wife's car where he armed himself with a .32 caliber revolver taken from underneath the dashboard.

He returned to the apartment, knocked on the door and entered. There was a party in progress with at least ten adult persons drinking and listening to music. The appellant's wife was sitting on a settee with the deceased, Joe Rawlings, and there was evidence that Rawlings was hugging the appellant's wife at the time he walked into the room. The appellant then shot his wife, who ultimately recovered, and shot Rawlings, who ultimately died. A few minutes later he shot a third person in the apartment, Henry Carl Stone, who also died from his wounds. There was further evidence that on the day before the murders, the appellant had warned the deceased Rawlings to stay away from his wife.

## I.

It is true, of course, that it is incumbent upon the trial court, when requested in a criminal case, to give an advisory instruction on every essential question or point of law supported by the evidence, *Bruce v. State,* 218 Md. 87, and *Mock v. State,* 2 Md. App. 771, but, for purposes of this case, the emphasis is upon the words *supported by the evidence*. In commenting on that degree of intoxication necessary to vitiate specific criminal intent, this Court held in *Michael v. State,* 1 Md. App. 243, 248:

> "The accused must do more than simply raise the issue of drunkenness to establish a defense. * * * He must persuade the triers of fact that, under the circumstances, he was so intoxicated as to be incapable of entertaining the specific mental intent or of possessing the mental state which is an essential element of the crime for which he is being prosecuted. To establish a valid defense, the appellant must show that he

.was so intoxicated that he was robbed of his mental faculties, and he will be considered criminally responsible as long as he retains control of his mental faculties sufficiently to appreciate what he is doing."

The essential issue to be considered in those cases where voluntary intoxication is advanced in derogation of criminal responsibility was framed by *Dubs v. State,* 2 Md. App. 524, 540:

"The issue in the instant case was not whether the appellant was drunk at the time of the commission of the crime; it was whether he was so intoxicated as to be incapable of forming the requisite intent."

Under circumstances very similar to those at bar, this Court in *Mock v. State, supra,* considered the propriety of the refusal by the trial judge to instruct a jury in a murder case on the effect of voluntary intoxication on the formation of criminal intent. Mock, as the appellant here, was convicted of murder in the second degree. Mock, as the appellant here, requested an instruction to the effect that the influence of alcohol on the defendant's mind could be enough to negate the presence of malice and therefore to lower the felonious intent from the murderous to that supporting only manslaughter. This Court upheld the action of the lower court in *Mock* in not giving the requested instruction to the jury on the ground that there was insufficient evidence to support the instruction. In the *Mock* case there was testimony that the defendant there had consumed two vodka collins and eight beers within a period of ten hours before the murder. There was testimony from Mock's fiancee that Mock was not walking well, that his speech was slurred, that he drove his car with a flat tire on the wrong side of the road, and that "he seemed to be in a daze"—all at a time one to two hours before the murderous assault. In the opinion of the fiancee, Mock was drunk. On the other hand, Mock himself testified that

although he was "feeling the beer" and was "high", that he was not drunk. This Court concluded at p. 775:

> ". . .we think that there was insufficient evidence of drunkenness to support the jury charge requested by appellant. The relevant test is not, as contained in the proposed instruction, whether the accused was 'under the influence of alcohol,' but rather whether 'he was so intoxicated as to be incapable of entertaining the specific mental intent or of possessing the mental state which is an essential element of the crime for which he is being prosecuted,' *viz.*, that he was so intoxicated that he was robbed of his mental faculties to a degree that he was incapable of forming the requisite intent when the act was committed. . . .

> We think such evidence, viewed in the light of appellant's actions after striking the decedent, as heretofore set forth, does not constitute evidence of drunkenness sufficient to support the requested charge."

The posture of the case at bar, as of the *Mock* case, is significantly different from that in *Avey v. State,* 249 Md. 385, reversing *Avey v. State,* 1 Md. App. 178. In the *Avey* case the critical question was the internal adequacy on the charge on intoxication itself, and not whether a sufficient factual predicate had been laid to require a charge on intoxication in the first instance. *Avey* furthermore was dealing with the crimes of assault with intent to murder and storehouse breaking, both crimes requiring a specific criminal intent whereas murder in the second degree requires a mere general criminal intent. In *Avey* as well, the defendant described his alcoholic intake in the five or six hours immediately preceding the crime as including "a pint of moonshine," and "nine or ten beers —maybe more." Avey further described his own condition as "quite intoxicated," "still under the influence," and "pretty well plastered."

In the case before us, the appellant did not take the stand to describe his condition at all. Six eyewitnesses to the murders were called by the State and none of them noticed any indication of any drinking at all on the part of the appellant, let alone intoxication. A witness, Edith Haines, stated that the appellant did not seem drunk and was not out of his head. A witness, John Hall, described the appellant's very articulate demeanor as he entered the apartment where the party was in progress and his well-controlled actions after the shootings. The host of the party, Jerry Harbaugh, described in detail the appellant's well-articulated greeting to him as the appellant entered the apartment as well as the appellant's conversation after the shootings as the appellant probed to find out who had organized the party and was "responsible" for it. A witness, Billy Hutchins, testified that right after the shootings, he asked the appellant if the appellant knew what he was doing and that he received the reply, "Yes, I know what I'm doing."

Detective Sergeant Baeschlin testified that when he arrived at the appellant's home within an hour of the shootings, the appellant was telephoning his sister to have her provide for his children. (In *Mock* we found a rational post-shooting telephone call to a hospital of significance in negating any debilitating degree of intoxication. *Mock, supra,* p. 775) The appellant asked the sergeant if he had a warrant. The appellant then informed the sergeant of the whereabouts of the murder weapon. The sergeant along with Detective Flaherty was with the appellant for several hours during a ride to police headquarters and an interrogation session in which the appellant gave a full version of the evening's events, although he insisted that neither written notes nor a tape recording be made of the conversation. The sergeant testified that the appellant appeared sober and sane and well-oriented. It was only in the course of the cross-examination of Detective Flaherty about the oral statement given by the appellant that any mention was made of the appellant's drinking. The detective recounted that appellant had said he had had

some beer and some vodka at some time before lying down and going to sleep on the evening of December 13. The only other testimony dealing with the appellant's drinking anything at all was by an employee of Johnnie's Tavern who testified that the appellant was in the tavern between 4:30 and 6:00 p.m. on December 13 and during that time had two cans of beer.

There were several other minor references to drinking in the appellant's brief but they are not part of the record on the question of guilt or innocence. They were taken from a psychiatric report which was read into the record for the sole purpose of showing some of the underlying data on which Dr. Adamo based his psychiatric conclusion.

The meagre shreds of evidence from which intoxication would have to be deduced in this case do not even approach that quantum of evidence found wanting in the *Mock* case, and we cannot say that the trial judge was wrong in concluding that there was insufficient factual support for the requested charge.

Furthermore, it is still the well-settled law in Maryland that "voluntary intoxication will not reduce murder to manslaughter", *Chisley v. State*, 202 Md. 87, 106, but will be considered simply for purposes of lowering first-degree murder to second-degree murder. Even in upholding the action of the trial judge on other grounds in the *Mock* case, this Court noted at page 775:

> "In so concluding, we do not depart from the holding in *Chisley* that voluntary intoxication will not reduce murder to manslaughter."

## II.

The appellant's second claim of error is that the trial judge did not instruct the jury, as appellant requested, on the "heat of passion" doctrine which might have served to negate malice and reduce the murderous intent to simply that supporting manslaughter. We feel that the trial judge was correct in his holding that a sufficient fac-

tual predicate had not been laid to support the instruction.

This Court held in *Whitehead v. State,* 9 Md. App. 7, 10-11, that there are four requirements to be met for the "Rule of Provocation" to be invoked in an attempt to lower murder to manslaughter:

> "(1) There must have been adequate provocation;
>
> (2) The killing must have been in the heat of passion;
>
> (3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;
>
> (4) There must have been a causal connection between the provocation, the passion, and the fatal act."

See *Perkins on Criminal Law* (2nd Ed.) pp. 53-69. All of these elements must coalesce for the doctrine to come into play.

*Lang v. State,* 6 Md. App. 128, 130-131, also discussed heat of passion and made it plain that before an instruction would be required on the subject of provocation, evidence must first be introduced from which the jury could find each of the required elements. The second and fourth elements are, by definition, subjective and internal to the actor. The first, significant for our purposes here, and the third elements are objective and will be measured not in terms of the defendant at bar, but rather in terms of the reasonable or ordinarily prudent man.

As early as *Garlitz v. State,* 71 Md. 293, 304, the Court of Appeals held:

> "It is not the particular disposition or temperament of the accused, but the nature of the alleged provocation, such as may be supposed to affect and influence ordinary minds, that may be considered in mitigation of crime."

In *Garlitz* the defendant attempted to employ his "shock, frenzy and distraction of mind" from the confession of infidelity made to him by his wife to lower murder to manslaughter. Notwithstanding his suggested state of mind, he was found guilty of murder in the first degree.

The finding by the appellant here of his wife at a party of ten adults, even were she in the act of hugging or being hugged by another man, would not represent legally adequate provocation to justify heat of passion and to invoke the "Rule of Provocation". The refusal of the trial judge to give the requested instruction was not error.

### III.

The appellant's third allegation of error is that in the course of the cross-examination of a psychiatrist called by the defense, the Assistant State's Attorney prejudicially impugned the motives and the integrity of defense counsel in contravention of *Reidy v. State*, 8 Md. App. 169. Notwithstanding the urging of the appellant, we feel that the situation at bar is in no way analogous to *Reidy*. In the *Reidy* case the prosecutor, in closing argument to the jury, referred to the defense of self-defense as "a fiction manufactured by the defense counsel." In that case, in addition to any other impropriety, the prosecutor was referring in his argument to matter not testified to by a witness or disclosed by the evidence in the case. A significant factor as well in the *Reidy* case was that the remarks, coming in closing argument and not being corrected by the trial judge in the face of an explicit request by defense counsel for such correction in the hearing of the jury, tended to indicate that the court was affirmatively sanctioning the position taken by the prosecutor. Such is not even remotely the situation at bar.

Dr. Ido Adamo, a psychiatrist at the Clifton T. Perkins State Hospital, was called as a witness for the defense. He testified that although the crime occurred on December 14, 1968, the appellant did not come to Perkins until April 25, 1969, and further that he, Dr. Adamo,

participated in his first staff conference on the appellant on June 26, 1969. At that time Dr. Adamo was of the tentative opinion that the appellant was sane at the time of the shootings on the previous December 14. Subsequent to that conference, Dr. Adamo saw the appellant two days later, on June 28, and at that time formulated the opinion that the appellant probably lacked the capacity to appreciate the criminality of his conduct on December 14, 1968. In the course of cross-examination of Dr. Adamo, the Assistant State's Attorney asked the critical question:

> "Doctor, if I tell you this case was originally set for trial in February and the insanity plea was not filed until after the case was originally set for trial, would that indicate perhaps this insanity is a newly made-up idea?"

Defense counsel immediately objected on the grounds that the question impugned the motives and actions of the defense counsel himself. The Court responded that:

> "This is a matter of cross-examination. He is simply asking if a filing of this later on would change his mind as to his motives."

In the course of the lengthy and spirited cross-examination, the Assistant State's Attorney had developed (1) that the appellant had never had any history of mental disease or defect prior to the shootings and further that he made no efforts to obtain diagnosis or treatment for any mental disease or defect even after the shootings, despite being on bail, until such time as his case had been scheduled for trial and (2) that amnesia about the event normally accompanies a mental defect of the type described by the doctor but that the appellant's explicit and detailed recollection of the event, recounted to police officers within a few hours of his arrest, belied the apparent amnesia about the event which he later represented to the various examining doctors. The thrust of the entire cross-examination, of course, was that the appellant was malingering. If motives were impugned, they were

the motives of the appellant and not the motives of the appellant's counsel. Malingering is frequently the critical consideration in the case of a disputed medical diagnosis. It is difficult to conceive of how adversary counsel could probe for evidence of malingering without, of necessity, impugning the motives of the defendant-patient. We see nothing improper in the line of questioning here.

## IV.

The final contention of the appellant is that during the course of his counsel's closing argument to the jury, the tactics, if not indeed the motives, of counsel were prejudicially impugned, this time not by the prosecutor but by the trial court. During the trial, the appellant had not taken the stand. In closing argument, the following exchange took place:

> (Mr. DePaul) "You can bet anything you have that if this man had even been convicted of anything my old friend would have brought it into the courtroom.
> (Mr. Chasanow) I object to that. I didn't have a chance.
> (The Court) Let the jury figure out what was said and what wasn't. It's pretty hard to fool twelve people."

If anything, the remarks of the Court in not sustaining the State's objection were mild. The clear import of the statement made by appellant's counsel was that since the jury had heard no evidence of a prior criminal record, there perforce was no prior criminal record. Such a position was neither factually correct, since it was candidly admitted in oral argument before this Court that the appellant did have a prior record, nor was it legally tenable.

In dealing with a situation where a defendant complained that he was prejudiced by the rebuke of the trial judge to his counsel in the course of questioning a witness, the Court of Appeals said in *Garlitz, supra,* 305:

"It would be strange, indeed, if counsel could make any sort of reckless assertion as to the law applicable to a case on trial, while arguing a question of evidence to the judge, and the latter was without authority to give expression to his full and emphatic dissent from the unwarrantable contention of counsel. This is certainly the right of a judge, and it may often be his imperative duty to exercise that right in a very positive and emphatic manner."

We see nothing improper in the remark of the trial judge in this case.

*Judgments affirmed.*