555 A.2d 509

**William Holtzman LEWIS**

v.

**STATE of Maryland.**

**No. 907, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

March 30, 1989.

Certiorari Denied July 21, 1989.

David Sapp (Nancy L. Cook, Assigned Public Defender, on the brief), Washington, D.C., for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before GARRITY, POLLITT and FISCHER, JJ.

POLLITT, Judge.

William Holtzman Lewis was convicted by a Montgomery County jury of:

Count 1—Attempted second degree murder of Charles Ahlquist.

Count 2—Attempted second degree murder of Edward Palmer.

Count 3—Assault with intent to maim Charles Ahlquist.

Count 4—Assault with intent to maim Edward Palmer.

Count 5—Assault on Charles Ahlquist.

Count 6—Battery on Edward Palmer.

Count 7—Battery on Todd Sweeney.

Sentences were imposed as follows: Count 1—20 years incarceration, with all but 8 years suspended; Count 2—20 years incarceration, with all but 8 years suspended; and Count 7—8 years incarceration. All sentences were to be served concurrently with the others, and Lewis was placed

on probation for 5 years upon his release from prison. The record of the sentencing hearing contains no mention of any disposition as to counts 3, 4, 5, or 6, but the docket entries indicate that the "court finds that all counts merge into counts 1, 2 and 7."

On appeal, Lewis presents essentially two questions, which we have condensed as:

I. Whether the trial court erred in refusing to instruct the jury on the defense of voluntary intoxication, ruling that there was no evidence to support that instruction?

II. Whether Lewis was denied a constitutional right to a fair and speedy trial?

Perceiving no prejudicial error, we shall affirm the judgments. The facts pertinent to each issue will be stated in the discussion of that issue.

I

On the evening of 26 September 1988, Jeff and Michael Ford, aged 18 and 16, entertained a large number of young people at their home in Burtonsville, Montgomery County. Appellant Lewis, 22 years old at that time, was one of the guests. As best we can determine from the record, some 20 persons, their ages ranging from 16 to 23, were in attendance at one time or another during the evening of September 26 and the early morning hours of September 27. All were drinking beer, some were drinking wine, some were smoking marijuana, some were sniffing cocaine, and some were doing all of the above.

At about 7:00 p.m., appellant, being the only person then present old enough legally to purchase alcoholic beverages, left the party and purchased five cases of beer,[1] which he brought back to the party for the use of all. He made

---

1. Jeff Ford's testimony was that the amount purchased was somewhat less, but we shall accept appellant's version for the purposes of our discussion.

another trip shortly thereafter to purchase two more cases of beer and two bottles of wine. During the next two hours, until the sortie to the local 7–11 Store hereinafter described, Lewis said he drank "a little bit over a six pack."

Sometime in the neighborhood of 8:00 or 9:00 p.m., the revelers received word that a friend of theirs, one Pat Kelly, was involved in a fracas at the nearby 7–11 Store, and several of them, including appellant, set out to rescue Kelly. It appears that Charles Ahlquist and Edward Palmer had inflicted some damage to the mirror on Kelly's vehicle and a physical encounter followed. After appellant and Kelly's other friends appeared, the altercation was limited to verbal assaults, but there was testimony that appellant threatened to shoot Palmer and Ahlquist. Lewis admitted that he threatened Ahlquist but only "because he threatened me."

After some verbal skirmishing, and shortly before the arrival of the police, reinforcements for Ahlquist and Palmer arrived, outnumbering Kelly's friends from the Ford party. Either because of the arrival of these reinforcements or because of the almost simultaneous arrival of the police (depending on whose version is accepted as true) the group from the Ford party returned thereto, where others who had not accompanied the group to 7–11 and some who had arrived in the interim were still drinking, "smoking pot and sniffing coke."

Todd Sweeney, 23, had arrived at the party at about 10:00 p.m. and was not present at the 7–11 encounter. George Lynard, 19, had met the group at the 7–11 and returned to the party with them. During the next few hours the group continued to drink and ingest drugs. Both Sweeney and Lynard, among others, testified that appellant said he would kill the people from 7–11 if they appeared at the Ford residence. At some time during this period, Lewis removed a .22 caliber rifle from a rack and carried it into the living room. Jeff Ford took the rifle away from Lewis, carried it to the basement and hid it behind a pile of clothes.

Appellant testified that during the entire evening he consumed "close to three sixes" (six packs) of beer, smoked "five joints" of marijuana, and sniffed "two or three lines of cocaine." Several other guests at the party testified to their own consumption of alcohol and drugs but none made any mention of the amounts consumed by others. With the exception of Todd Sweeney, who acknowledged that he drank "about three six packs" and ingested 1.5 grams of cocaine, acknowledged consumption by other witnesses was considerably less than that claimed by appellant, estimates ranging from five to eight beers, "some pot," and "a couple of lines of cocaine."

Meanwhile, the Ahlquist–Palmer group, after their dispersal from the 7–11, proceeded to a party at the home of one Eric Krouse. Apparently the beer was flowing not quite so freely and no drugs were present at the Krouse party. Ahlquist and Palmer each testified to having consumed only about three beers each and denied having used any drugs. After an hour, or two or three, everyone left the Krouse party and, according to Palmer, "they said Jeff [Ford] was having a party so we [Palmer and Ahlquist] went to see if they were there."

When Ahlquist and Palmer arrived at Ford's, Sweeney came out to their truck and warned them to leave. About ten other people came outside and proceeded towards Ahlquist and Palmer. When appellant discovered the presence of the new arrivals, he retrieved the rifle, located some bullets, went outside, loaded the rifle, and fired it in the air. He then approached their truck and told Ahlquist and Palmer to leave. He testified that as he approached the truck, Ahlquist grabbed the rifle and it accidentally discharged. Ahlquist was seated on the passenger side in the truck, Palmer was seated behind the steering wheel, and Sweeney was standing by the driver's window. The bullet went through Ahlquist's shirt sleeve, entered and exited Palmer's mouth, and lodged in Sweeney's tongue.

The police arrived shortly thereafter and Lewis was arrested. The arresting officer testified that he "had been

drinking," but that he cooperated with instructions, walked without assistance, had the ability to talk and communicate, was not yelling or screaming, and was not out of control. There was *no* testimony from the police or from any other witness, either for the State or for the defense, that appellant at any time demonstrated any of the usual signs of intoxication or that anyone specifically observed him consume any alcoholic beverages or any drugs.

Appellant testified in specific details as to his movements during the entire night and at the time of the shooting, including a demonstration as to precisely how he had pointed the gun and how Ahlquist had grabbed it. He stated, "I pointed it at Charles Ahlquist hoping that they would leave, you know, just get scared and leave."

In response to questions by defense counsel, he said:

Q. ... what was your intention concerning that?

A. To scare them away.

Q. Did you intend to harm anybody?

A. No.

Q. When you took the rifle, what was your intention?

A. Just to scare them.

\* \* \* \* \* \*

Q. Did you intend to harm Mr. Tod[d] Sweeney?

A. No, I did not.

Q. Did you intend to shoot or harm Eddie Palmer?

A. No, I did not.

Q. Did you intend to shoot or harm Charles Ahlquist?

A. No, I did not.

The only testimony as to his intoxication was:

Q. Have you ever been intoxicated?

A. Yes, I have.

\* \* \* \* \* \*

Q. Were you intoxicated that night?

A. Yes, I was.

Q. Have you been intoxicated more than once?

A. Yes, I have.

At the conclusion of the evidence, appellant requested a jury instruction on the defense of voluntary intoxication. The court replied:

I'm not sure it applies and I'll hear your argument, and all the evidence as I hear it has lead [sic] to he formed the intent, the intent was to scare and I don't understand how if you think that he was so intoxicated that he couldn't form the intent—the specific intent to murder, how that is consistent with the testimony that he had the intent to scare.

After further argument, the court declined to give the jury a voluntary intoxication instruction on the basis that there was no evidence that appellant was so intoxicated as to be unable to form a specific intent. Appellant's exception to the instructions as given was denied for the same reason. We agree with the trial judge.

Over 100 years ago, in *Spencer v. State*, 69 Md. 28, 13 A. 809 (1888), the Court of Appeals recognized the principle that when a party commits murder while in a state of intoxication, evidence of such intoxication may be admissible on the question of whether he was in such a state of mind as to be capable of deliberate premeditation. The majority of the Court, however, speaking through Chief Judge Alvey (Bryan and Yellott, J.J., dissenting), held that when it is shown by all of the evidence, that of the prisoner included, that there *was* deliberate premeditation in the perpetration of the crime, the principle was inapplicable.

In the case before us, *all* of the testimony, especially that of the prisoner, was that he was capable of forming and did form a specific intent to scare the victims. At no time did appellant even suggest that he was so intoxicated that he was robbed of his mental faculties or that he did not appreciate what he was doing, which is the test to be applied. The cases on the subject were reviewed fully in *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986), and, more recently, in *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989). As observed by the Court of Appeals in *Hook*, voluntary intoxication does not excuse murder, but it may

reduce murder in the first degree to murder in the second degree.[2] 315 Md. at 29, 553 A.2d at 235. The degree of intoxication required to negate specific intent, however, is substantial. As the Court emphasized in *State v. Gover,* 267 Md. 602, 607–08, 298 A.2d 378, 381 (1973)

> [T]he degree of intoxication which must be demonstrated to exonerate a defendant is great. Evidence of drunkenness which falls short of a proven incapacity in the accused to form the intent necessary to constitute the crime merely establishes that the mind was affected by drink so that he more readily gave way to some violent passion and does not rebut the presumption that a man intends the natural consequence of his act.

---

**2.** We now know that there is an offense of attempted second degree murder. *Hardy v. State,* 301 Md. 124, 140, 482 A.2d 474, 482 (1984). Even though second degree murder may be a general intent crime, *Bateman v. State,* 10 Md.App. 630, 635, 272 A.2d 64, 67, *cert. denied,* 261 Md. 721 (1971), it would appear that attempted second degree murder, as other attempts, is a specific intent crime. *Cox v. State,* 311 Md. 326, 330, 534 A.2d 1333, 1335 (1988), *aff'g,* 69 Md.App. 396, 518 A.2d 132 (1986). Thus, we have the apparently anomalous situation that, while voluntary intoxication is not a defense to second degree murder, *Chisley v. State,* 202 Md. 87, 106–07, 95 A.2d 577, 585–86 (1953), it may be a defense to attempted second degree murder. As recognized by the Court in *Shell v. State,* 307 Md. 46, 65, 512 A.2d 358, 367 (1986), the specific intent/general intent "distinction may be illogical and somewhat arbitrary." We think this case vividly demonstrates its illogic and arbitrariness. But for this anomaly, it would be difficult to perceive what more appellant could have gained had the requested instruction been given. As is evidenced by its acquittal of appellant on the charge of attempted first degree murder, it would appear that the jury considered his alleged intoxication even though not instructed on the issue, and no judgment was entered on the convictions of assault with intent to maim, the other specific intent crimes. (*But see Cirincione v. State,* 75 Md.App. 166, 171–72 n. 1, 540 A.2d 1151, 1153–54, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988), where Judge Moylan suggests that even second degree murder of the *intent to kill variety,* as opposed to the "depraved heart" or wantonly reckless variety, is a specific intent crime. Likewise, second degree murder of the "intent to inflict grievous bodily harm" variety may be a specific intent crime, *Smith v. State,* 41 Md.App. 277, 398 A.2d 426, *cert. denied,* 284 Md. 748 (1979), but one wonders whether such an intent would support a charge of "attempted second degree murder." We have no way of knowing what variety of second degree murder the jury found appellant attempted in this case.)

*See Hook, supra,* 315 Md. at 30–31 n. 9, 553 A.2d at 236 n. 9.

■ Appellant's argument appears to be that because he had consumed a large quantity of beer, and some marijuana and cocaine, this necessarily created a jury question as to whether he was so intoxicated as to be incapable of forming the specific intent to murder or to maim, even though there was no testimony, either from the appellant or from any other witness, that he was so affected. We reject that argument. The amount of alcohol allegedly consumed, standing alone, does not generate that issue.

Nothing in the cases cited by appellant supports his proposition. In *State v. Gover, supra,* 267 Md. at 604, 298 A.2d at 379, in addition to evidence that the defendant had consumed appreciable amounts of alcohol and eight "bennies," there was testimony from other witnesses that he was "high," "under the influence" and "very drunk." Gover testified that he was unable to recall the events and that his mind was a "blank" from sometime before the offense until he awakened in jail on the following evening. In *Avey v. State,* 249 Md. 385, 387, 240 A.2d 107, 108 (1968), the defendant said he was "quite intoxicated" and was "pretty well plastered," and that he shot the officer *"because I was drunk."* In *Smith v. State,* 69 Md.App. 115, 120, 516 A.2d 985, 988 (1986), in addition to evidence of ingestion of large quantities of alcohol and drugs, there was evidence that the defendant was "acting strange," was "down, drunk, unbalanced," made demands in a "dull monotone," was "totally out of it," "falling in the doorway," and literally was "feeling no pain." He passed out and slept for several hours immediately after the incident.

In *Avey* the Court of Appeals, and in *Smith* this Court, said the defendant was entitled to a jury instruction concerning the defense of voluntary intoxication. In *Gover* the Court of Appeals said the trial judge sitting without a jury should have made a factual finding as to whether the necessary degree of intoxication had been shown. Similarly, in *Beall v. State,* 203 Md. 380, 383–84, 101 A.2d 233,

234–35 (1953), the Court said the question of intoxication as bearing on an intent to murder was a question of fact to be determined by the judge in a non-jury trial, and that the evidence supported the judge's finding that there was such intent. Evidence raising the factual issue, from the defendant's viewpoint, included testimony that "there was a 'crazy man' who was drunk running around with a gun" and the defendant testified he "just went crazy." He did not remember many of the events of the evening.

In *Hook v. State, supra,* the defendant was convicted of two counts of first degree premeditated murder, first degree felony murder and armed robbery. The State, over defendant's objection, had *nolle prossed* charges of second degree murder. The Court of Appeals reversed, holding that the jury reasonably could have found Hook was so intoxicated as to lack the capacity to entertain the specific intent necessary to commit premeditated murder, which finding would reduce that offense to second degree murder. The Court further observed that the underlying felony supporting the felony murder charge—armed robbery—is also a specific intent crime to which voluntary intoxication can be a defense. If one is too intoxicated to form the specific intent to commit the underlying felony, proof of the underlying felony fails and there can be no conviction for felony murder. Under these circumstances, it was prejudicial error to permit the State to nolle prosse the second degree murder charges and to refuse a jury instruction on second degree murder.[3] The precise issue before us was not present in that case, but the Court restated that the degree of intoxication required to negate specific intent is substantial, citing to *Gover.*

---

**3.** The jury *was* instructed on the defense of voluntary intoxication as it applies to premeditated murder. Two witnesses had testified that Hook "had too much to drink," he wasn't "straight," "he was feeling no pain," "he was intoxicated" and "he gets violent when he drinks too much." Hook's confession also tended to show that he was intoxicated at the time of the killings. Evidence indicated that Hook and one of the victims had consumed large quantities of beer and Wild Irish Rose wine.

On the other hand, in *Mock v. State*, 2 Md.App. 771, 773–74, 237 A.2d 811, 812, *cert. denied*, 250 Md. 732 (1968), the evidence was that the defendant had consumed two vodka drinks and eight draft beers. His fiancee testified that to her he appeared to be drunk; that his speech was slurred; he was not walking well; and he drove his vehicle on the wrong side of the road on a flat tire. Defendant testified he was "high" and "feeling the beer" but that he was not drunk. We said the evidence was insufficient to support an instruction on voluntary intoxication. In *Myers v. State*, 58 Md.App. 211, 472 A.2d 1027, *cert. denied*, 300 Md. 484, 479 A.2d 373 (1984), the evidence that the defendant was intoxicated at the time he allegedly employed another to kill his wife was that, although drinking, he and others at the meeting were "not falling down. I mean, we had been in much worse shape than that." This Court held, among other things, that this testimony "would not permit a jury reasonably to conclude that he lost control of his mental faculties to such an extent as to render him unable to appreciate the consequences of his actions." *Myers, supra,* 58 Md.App. at 219, 472 A.2d at 1031.

In the case before us, although numerous witnesses testified to the drinking and ingestion of drugs by nearly everyone involved, not one of them testified specifically that he observed the appellant do so. Not one of them testified to observations of appellant's appearance or conduct that indicated he was intoxicated. More importantly, as we have observed previously, appellant's own testimony was that he knew precisely what he was doing and that he did form a specific intent to scare the victims. He cannot have it both ways. He cannot say that he formed a specific intent other than that required to support the charges against him, and at the same time say he was too drunk to form any specific intent.

We hold that the single fact that one has consumed what some may consider to be an inordinate amount of alcohol, standing alone, with no evidence as to the affect of that alcohol on the defendant, would not permit a jury reason-

ably to conclude that he had lost control of his mental faculties to such an extent as to render him unable to form the intent to murder or to maim.[4] The trial judge did not err in concluding that there was insufficient factual support for the requested charge. *Bateman v. State*, 10 Md.App. 630, 272 A.2d 64, *cert. denied*, 261 Md. 721 (1971).

## II

Appellant states his second issue as:

Whether the delay caused by a flawed psychiatric evaluation prejudiced the defendant's right to a fair and speedy trial under the United States Constitution, the Maryland Constitution and Declaration of Rights?

In an attempt to understand precisely what appellant is contending on this issue, we shall review the relevant chronology as best we can with the sometimes inadequate record.

(1) 22 October 1987—Appellant indicted.

---

**4.** We also note there was no attempt in this case to offer expert opinions as to the affect on the defendant of the ingestion of those quantities of alcohol and drugs, as in *Waltermeyer v. State*, 60 Md. App. 69, 480 A.2d 831, *cert. denied*, 302 Md. 8, 485 A.2d 249 (1984). There is a substantial body of literature stating that the quantity consumed, in and of itself, cannot furnish the basis for such an opinion. It is generally accepted by medical authorities that persons suffering from Jellinek's disease (named for Dr. E.M. Jellinek of Yale University, author of *The Disease Concept of Alcoholism* (1960), the first to define alcoholism as a bona fide disease), more commonly called "alcoholism," in the early stages of that disease, develop an extremely high tolerance of alcohol. As he drinks within his tolerance, he appears to think better and perform more efficiently. K. FitzGerald, *Alcoholism, The Genetic Inheritance*, at 33 (1988). Of course, as the disease progresses the tolerance decreases, and less and less alcohol is required to produce intoxication. Without knowing the level of one's tolerance, no good correlation can be observed between the amount of alcohol consumed and the degree of drunkenness displayed. F. Hofmann, *A Handbook on Drug and Alcohol Abuse: The Biomedical Aspects* (2d Ed., 1983) (by Dr. Frederick G. Hofmann, Professor of Pharmacology and Associate Dean, Columbia University College of Physicians and Surgeons, New York). In short, it is not the amount consumed but the effect on the consumer that is important.

(2) 28 October 1987—Appellant served with copy of indictment; trial date set for 14 March 1988.

(3) 2 November 1987—Appearance of counsel for appellant, demand for speedy trial, and plea of "Not Guilty" filed.

(4) 9 November 1987—Appellant files Motion to Suppress any statements of defendant, evidence seized from defendant, any pre-trial identifications of defendant, and request for hearing. Hearing set for 8 January 1988.

(5) 20 November 1987—Appellant files plea that (a) he is incompetent to stand trial, and (b) that he was not criminally responsible at the time of the alleged offense.

(6) 27 November 1987—Order signed by the court (Mitchell, J.) that defendant be examined by the Director of Clifton T. Perkins State Hospital, or his duly authorized agents, pursuant to § 12–107 of the Health–General Article "to determine whether the defendant, because of mental retardation or a mental disorder, lacked substantial capacity at the time of the commission of this offense, September 27, 1987, to appreciate the criminality of his conduct or to conform that conduct to the requirements of law." The court further ordered "that the Director, or his duly authorized agents, shall make an examination of the defendant, pursuant to Sections 12–101, 12–103 of the Health–General Article ... to determine whether the defendant is able to understand the nature and object of the proceedings against him and whether he is able to assist in his defense." The Director was further ordered to render a report of his findings within 60 days after the date of the order.

(7) 22 February 1988—Report filed by J. Burke Mealy, Ph.D., Clinical Psychologist, on behalf of the Community Forensic Screening Program of Clifton T. Perkins Hospital Center. That report advised the court

that appellant had been examined by Dr. Mealy; that in Dr. Mealy's opinion defendant was competent to stand trial; and that defendant was criminally responsible at the time of the alleged offenses.

(8) 7 March 1988—Appellant files "Motion for Appropriate Relief" alleging, in substance, that the examination by Dr. Mealy did not comply with Judge Mitchell's order of 27 November 1987; that more than 60 days from that date had expired; and that defendant had been denied his rights to a proper evaluation and report. The motion requested that the court either dismiss the indictment or "limit the testimony of the state."

(9) 11 March 1988—Hearing on the above motion was held before Judge Ruben and the motion denied. *The record does not contain a transcript of that hearing,* so we know not what transpired there other than what is disclosed by the docket entries.[5]

(10) 14 March 1988—Trial begins before Judge Raker.

(11) 15 March 1988—After the jury was seated, appellant made oral motion for psychiatric examination. Motion granted, jury excused and trial continued until 18 April 1988. *The record contains no transcript of the proceedings of these two days.*

(12) 17 March 1988—Order by Judge Raker that defendant be examined by the Department. Defendant is transported to Clifton T. Perkins Hospital for evaluation and report.

---

5. On 26 February 1988, a hearing was held before Judge Sanders on "defendant's oral motion to continue motion to suppress" (even though the Motion to Suppress had been withdrawn on 24 February 1988). At that hearing, appellant raised the question of the propriety of the evaluation by Dr. Mealy but the only relief sought was a continuance of any hearing on his motion to suppress until after a "proper" evaluation of his competence had been made. When the court denied his motion for continuance; he again withdrew his motion to suppress. While Judge Sanders opined that Dr. Mealy's report was in "substantial compliance" with Judge Mitchell's order, he specifically did *not* rule on the validity of the report.

(13) 18 April 1988—Trial begins. It is noted the report
has been received from Clifton T. Perkins Hospital
and trial proceeded.[6] Nothing in the record indicates
that defendant objected to the report, made any
request for an opportunity to study it, or *made any
motion to dismiss or for any other relief.* The case
proceeded to trial and appellant was convicted of the
charges aforementioned.

Based on these events, appellant now contends:

A. That the first evaluation did not comply with the
statute because it did not take place at Clifton T.
Perkins State Hospital and because it was performed
by a psychologist instead of a psychiatrist.

B. That receipt of the report of the second evaluation
four days before trial denied appellant the opportuni-
ty "to adequately litigate the issue of his competency
and sanity."

C. That the delay caused by the improper evaluation
procedures denied appellant's right to a speedy trial.

We observe at the outset that neither question B nor
question C was either raised in or decided by the trial court.
While it appears that question A was raised, in the "Motion
For Appropriate Relief" filed 7 March 1988, and, according
to the docket entries was denied by Judge Ruben on 11
March 1988, because the appellant has not furnished us
with a transcript of that hearing, we do not know what
Judge Ruben ruled. If he ruled that the initial evaluation
was adequate, that ruling apparently was reversed by
Judge Raker on 15 March 1988 when she ordered a new
evaluation. Unfortunately, appellant also has failed to pro-

---

6. The report, dated 12 April 1988 and placed in the court file on 25
April 1988, advised that it was the unanimous opinion of the doctors
present at the staff conference that appellant was competent to stand
trial and was responsible at the time of the alleged offenses. There is
no indication in the record that the report was ever received in
evidence. Appellant's competence was simply not an issue before the
jury.

vide a transcript of the proceedings of 14 and 15 March before Judge Raker.

At a hearing on his motion for new trial, on 22 June 1988, appellant raised for the first time the question now designated "B." The court reminded counsel that he had not requested a continuance and had not raised an issue of insufficient time to prepare an "insanity" defense. Counsel said, "Well, I agree, Your Honor." Nothing further was said about the matter. Since the matter was neither raised in nor decided by the trial court, it is not before us. Rule 8–131.

The same is true as to the alleged denial of a constitutional right to a speedy trial. The "Motion For Appropriate Relief" filed 7 March 1988 sought to have the case dismissed because appellant allegedly had not been evaluated properly within 60 days. It did *not* raise the speedy trial issue. The denial of a speedy trial, like other constitutional rights, may be waived by a failure to assert the issue below. *Price v. State,* 235 Md. 295, 201 A.2d 505 (1964); *Kirby v. State,* 222 Md. 421, 160 A.2d 786, *cert. denied,* 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74 (1960). That issue also is not before us. Rule 8–131. Were it before us, we would hold that the delay of approximately six months under the circumstances of this case was not of constitutional dimension. *See Fuget v. State,* 70 Md.App. 643, 522 A.2d 1371 (1987). We also observe that delays in the proceedings caused by examinations to determine defendant's competence are charged against the defendant because such evaluations are solely for his benefit. *See, e.g., Langworthy v. State,* 46 Md.App. 116, 416 A.2d 1287, *cert. denied,* 288 Md. 738 (1980), *cert. denied,* 450 U.S. 960, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). Even if time limits for such reports are violated, dismissal of the case is not the appropriate sanction. *Harvey v. State,* 51 Md.App. 113, 441 A.2d 1094, *cert. denied,* 293 Md. 616 (1982). Maryland Code (1982, 1988 Supp.), § 12–110(c)(2) of the Health–General Article.

■ Appellant's remaining question is based on the false premise that his initial examination by Dr. Mealy was illegal because it was not conducted at the Clifton T. Perkins State Hospital and because it was performed by a psychologist instead of a psychiatrist. He is wrong. We find nothing in the Health–General Article of the Maryland Code supportive of his position. The place of such examinations and the persons performing them are as designated by the Department of Health and Mental Hygiene. Code, Health–General Article, § 12–110. "[I]n practice, competency examinations are done, on a statewide basis, by local screening units under grant from the Department, rather than by the Department directly. On a more limited basis, these local screening units also do examinations in connection with pleas of insanity." *See* Revisor's Note to Code (1982) Health–General Article, § 12–103.

Before 1978, the Clifton T. Perkins Hospital Center and other facilities of the Department were overloaded with persons who, for one reason or another, had filed "insanity" pleas in criminal cases. Many of those people were found to have been referred when they obviously were both competent to stand trial and criminally responsible. Hospital beds were occupied by those with no need to be there, resulting in long waiting lists, extensive delays in criminal trials, and much unnecessary expense. To help alleviate these problems, the Community Forensic Screening Program was established, first in Baltimore City in 1979 and expanded to include all the counties by 1984. Trained mental health professionals, not necessarily psychiatrists, were organized throughout the State to screen out those who unquestionably were both competent and responsible. Anyone who, in the opinion of the screener, was "possibly not competent," was sent to Clifton T. Perkins Hospital for a full evaluation. Since its inception, the program has had the full support of the Chief Judge of the Court of Appeals in his capacity as administrative head of the judicial system, the Conference of Circuit Court Judges, and the Chief Judge of the District Court. *See generally,* Rappeport,

Conti and Rudnick, *A New Pretrial Screening Program*, 11 Bulletin American Academy of Psychiatry and the Law 239 (1983).[7]

 Dr. Mealy was perfectly capable of reporting to the court at least as to appellant's competency to stand trial. Nothing in the statute requires testimony of a psychiatrist for the court to determine competency. *Hill v. State*, 35 Md.App. 98, 369 A.2d 98 (1977). The Department, in its discretion, may conduct a competency examination by a community forensic screening program or other agency that the Department finds appropriate. Code, Health–General Article, § 12–104(c)(2)(i)2. Any question as to Dr. Mealy's competence to opine on the issue of appellant's criminal responsibility was rendered moot by the subsequent examination and evaluation at Clifton T. Perkins Hospital Center.[8] That report, though not formally received in evidence, properly was considered by the court. *Sangster v. State*, 312 Md. 560, 541 A.2d 637 (1988), *aff'g* 70 Md.App. 456, 521 A.2d 811 (1987). There is *no* evidence in this record either that appellant was not competent to stand trial or that he was not criminally responsible at the time of the offenses. While the trial court must find beyond a reasonable doubt that the defendant is competent to stand trial, the burden of pleading, producing evidence, and persuading the trier of fact by a preponderance of the evidence that he is not criminally responsible, is upon the defendant. *Treece v. State*, 313 Md. 665, 547 A.2d 1054 (1988). The latter issue was not generated, and we think the procedures employed

---

7. Dr. Jonas R. Rappeport, Chief Medical Officer, Medical Service of the Circuit Court for Baltimore City and Director of Coordinating Team, Community Forensic Screening Program: Nicholas P. Conti, Medical Administrator, Medical Service of the Circuit Court for Baltimore City and Administrative Coordinator, Community Forensic Screening Program; Dr. Barry Rudnick, Director, Baltimore City Pretrial Screening Service, and Director of Training of Forensic Psychiatry Program, University of Maryland.

8. *But see* Maryland Code (1984 Repl.Vol.), § 9–120 of the Courts and Judicial Proceedings Article. If properly qualified, Dr. Mealy was competent to express such an opinion.

**20**

adequately enabled the trial court to find beyond a reasonable doubt that appellant was competent to stand trial and adequately protected his due process right to a fair trial.

JUDGMENTS AFFIRMED; APPELLANT TO PAY COSTS.